[Crim. No. 2602.   Third Dist.   Oct. 13, 1955.]

THE PEOPLE, Respondent, v. WILL JONES, Appellant.

Norris M. Goodwin and Albert M. King for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

VAN DYKE, P. J.—Defendant appeals from a judgment based upon a verdict by which a trial jury found him guilty of the charge of murder in the first degree with the penalty fixed at life imprisonment. On motion for new trial the court modified the verdict by reducing the degree to second. The People have not appealed.

Defendant-appellant contends that the evidence is insufficient to justify a conviction of second degree murder; that the court committed prejudicial error in the refusal of a requested instruction and in the rejection of evidence; and that the district attorney was guilty of such misconduct that the judgment ought to be reversed therefor. In order to pass upon these assignments of error it is necessary to state the evidence somewhat fully.

Appellant was boarding at the home of Marguerite Bivens, paying $20 a month room rent and supplying funds in various amounts for living expenses of the two. Mrs. Bivens was a widow, her husband having died after appellant came to room and board with the pair. Appellant and Mrs. Bivens had occasionally quarreled and sometimes these quarrels were bitter. He worked as a laborer. He was 54 years of age when he killed Mrs. Bivens. He had little education, was illiterate and the court-appointed expert pronounced him to be a simple-

ton. He said appellant could count from 1 to 10, but could not count from 10 to 1 backwards, could not subtract and gave other signs of low mentality; that his memory was very hazy; that when the witness asked him who his attorney was, naming one of his court-appointed counsel, appellant said he had never seen him before and wasn't sure about the names of his counsel; that he was nervous and excitable, but slow to get angry, and was inclined to agree with everybody; that his mental level was about 6th grade; that his reflexes were sluggish, which the expert attributed to his low intelligence; that he was quite open to suggestion and the expert gave this example: that if you stated it is now 10 o'clock on an Easter morning he would agree with you; that he had sufficient intelligence to form the intent to kill somebody and to commit premeditated murder; that being a simpleton he would say things he didn't mean and sometimes contradict himself without meaning to do so; that for him to answer a question took a lot of premeditation and on most of the questions the expert had asked him he wouldn't have any idea what the expert was talking about, would answer yes or no and if brought back to the subject a few minutes later would not recognize it as the same subject matter.

A Mrs. Beasley, who had long lived across the street from the home of Mrs. Bivens and who knew her well, testified that she met Mrs. Bivens a short time before the killing occurred and went into her house with her. There she saw appellant, and a man unknown to her and who was not a witness at the trial, sitting in the living room of Mrs. Bivens' four-room cottage. They were watching television. The two women went into the kitchen and Mrs. Bivens called appellant who went to her and started talking with her. After some talk both went into the back bedroom where they continued to talk, but were now using bad language. The witness said "when it got so hot I left . . . the kitchen and went into the back bedroom where they both were." She tried to quiet the two, but couldn't stop them. Mrs. Bivens told appellant she wanted him to leave the house and get out, that she was tired of him coming in "full of wine" and "raising hell." He replied that he did not raise any more hell than did Mrs. Bivens, that she came in at 3 or 4 o'clock in the morning full of wine and he made no protest. She replied it was her house and she could come and go as she pleased. Then said the witness: "He called her a bad name and she rushed through the hall." The witness moved back into the living room. The other man

was gone. Through an intervening door she saw Mrs. Bivens go to a dresser in her bedroom, pull the drawer out and get a package which was wrapped in a white cloth of some kind. At that point she hurried from the house. She said she expected something bad to happen. She heard a shot and in five or six seconds she heard three more fired in rapid succession. The argument between appellant and Mrs. Bivens was described by the witness as being very loud. She said they were shouting at each other, using bad language and that while she didn't run from the house she wanted to get out as quickly as she could for fear of what was going to happen. (It may be said here it is not disputed that the object Mrs. Bivens took from her dresser drawer was a revolver in its scabbard, the whole wrapped in a white cloth. She was killed by shots from this gun.) Aside from the foregoing, the only direct testimony as to the homicide by an eyewitness was that of appellant himself. His testimony on direct examination follows: He came to California in 1951 and moved directly to Oroville, where he had lived since. After rooming around at various private homes he went to the Bivens home where he stayed two years and up to the time of the homicide. He and the Bivenses were good friends. Although merely a roomer and boarder, he occasionally bought food for the household and helped in every way he could. After Mr. Bivens died he stayed on as roomer and boarder. He continued buying some groceries, spending all he had on room rent and food for the household. He bought a television set in Mrs. Bivens' name, but he wanted it to entertain his friends. He had quarrels with Mrs. Bivens after her husband died; both she and her daughter "jumped on" him. She sometimes threatened to "fill me full of lead," but he paid no attention to that. She had sometimes got the gun and threatened him and he would just walk away. Every other time but the last when Mrs. Bivens had threatened him with the gun he had been in a position where he could run away. Appellant testified further, without objection, that he had never in his life been in trouble with the police, never had been picked up for any crime, never had been questioned for any crime, never had a traffic ticket and that his record was completely clean. He said that on the morning of the homicide he went to the Union Hall to see about work, stayed there about an hour, went back to the Bivens cottage, cut some grass and then went to a neighbor's house where he and three other men in the course of several hours drank one-fifth of wine. On his

way to the neighbor's he met Mrs. Bivens who asked him where he had been. He told her he had been out to the Union Hall, but had not gotten any work. She then said: "I am going to fill your rump with lead." He laughed and said "I know what you mean by that" and kept walking. She had said things like that before. He thought nothing of it. He returned home about 6 o'clock with the man that Mrs. Beasley saw with him and sat down to watch television. When Mrs. Bivens came in she called him and he went to where she was. She said, "You are drunk" and he said, "Drunk with what? You ought to be the last person to say about drunk." She said "I am going to fill your rump with lead" and he said "Uh-huh" and thought no more about it until she came in with the pistol. He knew then she was going to shoot him, but was afraid to run because "by running she'd shoot me sure as the world." He was sitting down, she had the gun in her hand; it wasn't wrapped up. We quote the following from the transcript: "Q. Do you remember the discussion that you had with her before she got the gun? A. Wasn't too much, just a couple words, just said she was going to fill me full of lead. Q. She said that at that time, did she? A. She said that twice, two times and I didn't pay no attention. Q. Did you think she was fooling? A. Well, I don't know, she couldn't have been because she got the gun, she couldn't have been fooling, . . . Q. (Int) Was this discussion loud or quiet? A. You could hear her cussing, anybody passing by knew she was cussing. Q. Why did you go back and sit in the chair? A. I never gave her a thought that she would try to do anything to me, I didn't think about she was going to try to hurt me or anything like that. . . ." Appellant said Mrs. Bivens got the gun and "put it on" him and he didn't know what to do. He was afraid to run and if he had had the least thought she was going to pull a gun he would have done like he had been doing, run up the alley. He had seen her get the gun before but she had not pointed it at him; she had kept the gun hidden and he couldn't find it; if he had been able to find it he would have sold it; it was his gun; he had bought it while night watching. When she came toward him just before the homicide he first saw the gun when she was a little more than 2½ feet away. She was holding it down. It looked big to him. She was cussing him, calling him a "son of a bitch" and things like that. He sat there trembling, wanting to run, "if I could have got my foots going I wouldn't have been here, if I could have got my foots going I'd been

up the road by now.'' She kept cussing him, with the gun pointed at him. He was so scared he voided both his bowels and his bladder. He was afraid to run; he said to himself ''if I rush she is going to shoot me and if I sit here she is going to shoot me, I am going to try to do something,'' so he jumped up and grabbed her and the gun. She had the handle and the trigger and he had hold of the short barrel. They were tussling; he tried to keep her from shooting the gun; they kept tussling until the gun went off. When the gun went off she still had hold of the butt and he of the barrel and he was turning the gun around. After the gun went off he got the gun; he was scared and nervous; he whirled with the gun and the gun went off; he couldn't put it down. He didn't know how long it was between the first shot and the time the gun went off again; after the gun went off the first time they were still tussling for it. She was a stout woman; she had his shirt and tore it off of him; she still had hold of him after the first shot was fired. By twisting and twisting he got the gun; he didn't intend to shoot her, but being scared and nervous he was upset from looking down the barrel of the gun. He had a pretty hard time getting the gun away from her. He couldn't tell how long it was before the second shot was fired, maybe a minute, maybe a second. After the gun was fired the last time he left the house, walking pretty fast. He would walk awhile and rest awhile, he went out by the schoolhouse, then down by the drive-in theater, then down to a creek and a little pond, where he found water; he washed himself as best he could because he was nasty; he washed his stockings and shoes and washed them out; he washed his trousers out. He did not sleep during the night. He had no intention of running away, was still walking when the officers picked him up and took him to the sheriff's office. It was then sometime in the morning. When Mrs. Beasley had been calling him bad names and when he was pointing the gun at her he was not angry at her, he was scared. (At this point appellant was asked if Mrs. Bivens had ever told him about her past. He said she had and then he was asked what it was she had told him. An objection on the ground that the testimony was incompetent, irrelevant and immaterial and that no foundation had been laid was sustained by the court. His counsel then argued that he had established the fact the man was in a frightened state of mind and upset by the things that had happened, and he wanted to show that in the past Mrs. Bivens had told him something. The court excused the jury,

and counsel offered to show that on a number of occasions prior to her death Mrs. Bivens had told defendant she had served a term in prison for assault with a deadly weapon. The court refused to admit the evidence. And as to this ruling appellant charges prejudicial error.) Before the homicide occurred she had threatened him with the gun. "She make the break to get the gun and I am outdoors and I watch through the glass, I'd be out in the garden cleaning up or something or digging or something and I watch through the glass and she'd go in for the gun and I'd take off, I cut corners—I'd be shoveling and raking and I seen her through the glass and when she'd go in there for the gun I'd go away. . . . I saw her get the gun three or four times but sometimes I didn't see her, I know she was going after the gun and when she would go I was gone, I don't know what she do, I do know she'd go and get it two or three different times, I do know that." He said that he would go off and stay all evening, he was afraid of her. When she first pointed the gun at him on the evening of the homicide he was scared of his life, he thought he was going to get killed. After he got the gun he was still scared. "Sure, I was still scared, what chance I miss from being dead, you look down the barrel of the gun and you wouldn't wonder. . . . I saw so many things, I seen a graveyard I reckon, wasn't far from it. . . . Q. You felt you were right on the brink of death? A. That's right."

We have given the substance of appellant's testimony on direct examination by his counsel after the People had rested their case. We did this to group the testimony of the only two eyewitnesses to the homicide. After the People had introduced the testimony of the autopsy physician who described the wounds received by Mrs. Bivens, and the testimony of Mrs. Beasley, they put an officer on the stand who testified as to the arrest of appellant and his examination by the officer. After some two hours of talking with appellant the officer had called the district attorney and a statement was taken in shorthand and typed. This was introduced and read in evidence and therewith the State rested. Before discussing that statement we will summarize the testimony of the autopsy physician. He said that one bullet had entered the body of deceased 3 inches below the collarbone on the left side. It was directed downward and in its course ripped through a branch of the pulmonary artery, then passed through the lungs and into the right chest across the body. This was the bullet which was responsible for the death. Of

the other three bullets that struck deceased's body two would have caused death after some time. One had entered under the right breast, penetrated the chest and its track appeared to cross the track of the first bullet and it was lost in the tissue of the lungs where there were extensive injuries. The third bullet entered the abdomen just above the left hip and went from the left to the right and slightly downward to pass through the small intestine and lodge in the bone of the right hip. A fourth bullet entered the outer portion of the arm, passing through the fleshy part and broke the skin of the chest wall, but did not penetrate it. The bullet which caused death did so within a short period of time, probably a few minutes, death being from loss of blood. There were no bruises nor scratches on decedent's body or powder burns on her skin, but there were black markings on decedent's dress which the physician said he assumed were powder burns, and they marked the entry of the bullet that had been the cause of death. A criminologist testified that he had examined the dress worn by decedent. He said the only place he had found powder marks was around the bullet hole below the left shoulder and he estimated that when the gun was fired it was about a foot away from the body of decedent.

The extrajudicial statement of appellant introduced in evidence was taken during the day following the killing. This statement is bitterly attacked by appellant as having been most unfair. Appellant's counsel say it was taken by an experienced prosecuting attorney who knew the killing had been admitted and had discussed the appellant's story as given to the officer, and had learned of the moronic mentality of appellant and set out to lead him through suggestion into establishing premeditation and malice so as to obtain from a jury a verdict of first degree murder. They say his conduct amounted to leading a stupid sheep to the abattoir. The interview opened by the prosecutor as follows: "Q. And you understand that this is Captain Christensen from the Sheriff's office and Deputy Longacre and I am Mr. Leonard the District Attorney, you know that, don't you? A. Yes. Q. Now, I want to talk to you about the death last night of Mrs. Bivens, and understand that we are not going to force you in any way to talk and that nobody is going to beat you or be mean to you, you understand that? A. I understand that. Q. That any statement you make you make freely and voluntarily on your part, and we can't promise you any privilege or any immunity or anything like that, you understand that, don't

you? A. That is right. Q. Now based on that understanding are you willing to tell me just what happened? A. Well, to the best of my knowledge I will.'' The interview continued with the background as to appellant's residence in the home of Mrs. Bivens. The attorney asked appellant if Mrs. Bivens had been friendly and got along all right and he answered yes with the exception of a few little spats, ''Q. Maybe had a few little spats? A. That is right, . . . you know, come in and get into a little spat and I would go on out, go up the street, go get some soda water, forget about it. Q. You never had any real fights with her or anything? A. No. Q. Did she ever threaten to kill you? A. Yes, once, couple of times. Q. When was that? A. Oh, before Christmas. . . . Q. Let us take for the week preceding last night, you hadn't had any particular bad fight with her? A. I had no quarrel with her, . . .'' Then having covered appellant's acts during the day up to the time he came to the Bivens home and was looking at television the matter of the argument between the two was gone into, including the arrival of Mrs. Beasley. ''Q. That is Mrs. Beardsley? A. She is going to come in the front door and she said, 'What is the matter now Margaret?' Q. That is Mrs. Bevins, Margaret? A. Yes, that is right, and at that time she said, 'I am going to fill your damn hide full of lead.' Q. Margaret said that to you? A. Yes. Q. You were sitting there in the front room? A. Yes. Q. And she was standing in the front room there? A. Yes, she got the pistol out of the drawer. Q. Did she leave the front room, is that right? A. Yes. Q. All right then, did you see her in the other room, in the bedroom? A. Yes. Q. Did you see what she was doing? A. Yes. . . . Q. You saw her open this drawer, is that right? A. That is right. Q. And what did she bring out of the drawer? A. Pistol. Q. Was the pistol wrapped up in anything? A. Yes, in a scabbard and had a piece of cloth wrapped around it. . . . Q. And then she took the pistol out? A. That is right. Q. Now, in the meantime were you talking to her at all, when you saw her go in there to get the pistol did she say anything or you say anything? A. I didn't say anything to her when she got the pistol. Q. Was she talking to you when she got the pistol? A. She said she would blow my damn brains out and I was scared, I am going to tell you the truth, I was scared. Q. You were scared? A. Sure I was scared. Q. Well, did you try to run out the door or anything like that? A. No. Q. Well—— A. (Int) So I grabbed her. Q. When you grabbed her had she unwrapped the cloth from the pistol yet? A. Yes, sure,

had the pistol in her hand. Q. Had she taken the pistol out of the scabbard? A. No, just unwrapped it. Q. Where was the scabbard? A. In the box, she knows where it were. [It is at this point that there begins the discrepancy between the direct testimony and the statement; and the first discrepancy is not by answer to a question, leading or otherwise, but by a volunteered statement.] Q. Now, did she point the pistol at you? A. Well, she pointed the pistol at me too but I grabbed it and twisted it out of her hand. Q. She had the pistol, she unwrapped it, took it out of the scabbard? A. And was coming towards me. Q. And she started walking towards you? A. Yes. Q. And about that time was that when you got up out of your chair or had you gotten up before that? A. No, I was getting up. Q. You were getting up when she was going for the pistol? A. And she hit me right here, (Indicating), I sure enough felt it and I grabbed the pistol out of her hand. Q. All right now, and then she pushed you back down into the chair? A. That is right. Q. And you wrenched the pistol out of her hand, were you sitting in the chair when you did that or did you stand up? A. I was getting up out of the chair, I was standing up. Q. You stood up and you took the pistol out of her hand? A. That is right. Q. Now then, what were you doing, what was she doing then, were you both just standing? A. No, she was still talking to me, what she said, I don't remember. Q. She was talking to you? A. Yes. Q. But you don't remember what she said? A. No, I guess not. Q. Now, you knew when you took the pistol out of her hand that she wasn't armed then, in other words, she didn't have a gun after you took the pistol out of her hand? A. That is right. Q. And you knew she couldn't hurt you right then, didn't you? A. Yes. Q. You had the pistol and she didn't, isn't that right? A. That is right. Q. Well now, is that when you decided that you were going to kill her? A. Yes, that is about when I decided. Q. That is about when you decided, after you took the pistol out of her hand she was disarmed and you just decided right then and there you were going to kill her, is that right, did you say anything to her? A. No. Q. Did she say anything to you? A. That is when she said, 'Fats, don't shoot me no more.' Q. Did she say anything like, 'Don't shoot'? A. After I shot her the first time and she fell on the floor. Q. How long a time elapsed between the time you took the gun away from her and the time you fired the first shot? A. How long was it? Q. Yes, how long was that, do you have

186

any idea? A. No, I don't have no idea. Q. Well, I mean, did you stop and think about it for a second? A. I stopped, I didn't shoot her all at one time. Q. No, I mean before you fired the first shot after you took the gun away from her did you stop and think it over for a minute and then decide you were going to shoot her? A. No, when I got the gun, I twisted it out of her hand and shot her. Q. Did you do that all in one motion or did you get the gun out of her hand and then think it over and then decide you were going to kill her and then aim the gun at her and then—— A. (Int) No, when I got the gun I shot it, when I twisted it out of her hand I shot her. Q. What I am getting at, you knew you had the pistol away from her, you had the gun away from her, didn't you? A. That is right. Q. And you already told me that is when you decided you were going to kill her, is that right? A. Yes. Q. All right, all I am trying to find out is whether that happened just in a matter of seconds or whether you stood there a second or just what you did? A. Must have done it all at one time. Q. Well you didn't decide to kill her until after you got the gun away from her? A. No, I wasn't thinking about it, I was going to get up and leave. Q. And then you aimed the gun at her and you shot her and she fell to the floor. A. Yes, I aimed and shot as soon as I got it and she fell. Q. Now at that time when she fell to the floor she wasn't unconscious, she was still—she knew what was going on, didn't she? A. Yes, she asked me not to shoot her any more, she said, 'Fats, don't shoot me no more.' Q. Now, could you tell us where you hit her? A. No. Q. But you know that she was alive then? A. That is right. Q. Then what did you do, did you wait for a minute? A. No, I just shot again. Q. Well I mean, how long was it from the time you shot her the first time until you shot her the second time? A. About a second I guess, it must have been, three quarters of a second. She fell and I looked at her and I shot her again. Q. After she fell down she had time to say, 'Don't shoot me no more, Fats'? A. Yes. Q. Did you say anything to her? A. No. Q. When she fell down after you shot the first time where was she lying? A. On her back. Q. She was lying on her back? A. Yes. Q. Was she sitting up at all trying to get up, anything like that? A. No. Q. Well now, you realized didn't you that after you had shot her that she couldn't hurt you then, I mean she couldn't have done anything to you because she was lying on the floor, right? A. That is right. Q. And also you knew she wasn't dead yet, in fact you didn't

know how badly you had wounded her? A. No, I sure didn't. Q. But you had decided by then that you were going to kill her and that is why you shot again, is that right? A. I guess it must have been, I shot, I guess that must have been. Q. And you shot her the second time, now, did she say anything to you after you shot the second time? A. No. . . . Q. Now did you point the gun down at her like I am indicating, in other words, (demonstrating)? A. Yes. Q. She was lying on the floor and you stood about two feet from her and pointed the gun down at her body and pulled the trigger, is that right? A. That is right. Q. All right, and then did you shoot her again after that? A. Well, I made four shots. Q. You shot her four times? A. That is right. Q. Well now, was there some interval of time between those shots, you understand what I mean? A. I understand, did I wait a piece. Q. Did you wait any time at all between the shots? A. I don't think I did. Q. Or did you just go bing, bing, bing, bing, four times as fast as you could pull the trigger? A. No, I didn't pull the trigger that fast but I don't know, I don't know about that but it wasn't as fast as I could pull the trigger. Q. In other words, you realized what you were doing when you shot her those other three times, you wanted to make sure she was dead, is that right? A. Well, I guess I must have. Q. And you only had four shots in the gun, didn't you? A. That is right. Q. If you had any more in there you would probably have shot whatever you had in the gun? A. No, I don't think I would have shot any more. Q. You think four was enough, well, did you realize then that she was dead by the time you finished firing? A. No, I didn't think she was dead, no I didn't. Q. Did you stop to see whether she was breathing or not? A. No, I didn't." The questioning went on as to his acts after the shooting, establishing that he did not attempt to find out if she was dead, did not call the doctor nor the police, although he knew the police were going to be looking for him, that he didn't turn himself in, but didn't know why since he wasn't going to go anywhere, that he never went back to the house. The following then occurred: "Q. Well, the sum and substance of it is that you had this fight and she called you a bad name and you called her a bad name? A. I didn't think anything about that, what happened as far as the bad names. Q. You didn't worry about that? A. No, because she called me them so many times. Q. And then she went in and got the gun? A. That is right. Q. And you took the gun away from her? A. Yes. Q. And after you took

the gun away from her you decided you were going to kill her, is that right?  A. Well, I guess that is what I did. Q. Why did you decide to kill her, were you mad or what? A. I don't seem like I was.  Q. You were just kind of disgusted?  A. I guess I must have been.  Q. And you weren't mad and you just decided you were going to kill her and you did and that is about it?  A. Yes, I guess that's right, that is about it, except you don't know how those people jumped on me, and her daughter would jump on me, of course you don't know all that. . . . Q. You mean they nagged at you?  A. Yes.  Q. They would argue with you?  A. No, she hit me, my face was all swollen for four or five days. Q. You weren't afraid of Margaret were you?  A. I was scared when she had the gun, scared about anybody with a gun.  Q. You were afraid Margaret was going to beat up on you?  A. She wasn't one to fool with too much.  Q. You knew you were stronger than Margaret, you weren't afraid of her beating you up?  A. No, if I kept out of the way I know she couldn't beat me up but I know she did fight, I know that and I know if she got her hands on something she would sure hurt you, but they all jumped on me.  I wasn't going to bring that up but you know that is the truth. . . . Q. Are you sorry now you shot this woman?  A. Well, I am in a way and in a way I am not. . . . Q. You don't feel too bad about it one way or the other?  A. Well, I kind of feel pretty bad about it but not too bad.  Q. You don't feel too bad about it?   A. Because I have been mistreated around the home and I was just helping her out, helped her pay her bills and thought I was doing her a favor.''

As we have said, the People rested with the introduction into evidence and the reading to the jury of the statement of appellant and appellant took the stand in his own behalf as the first witness for the defense.  He testified as we have hereinbefore related and was then taken on cross-examination. It was apparent by that time that if the jury believed that the defendant had fully stated the facts and circumstances to the prosecuting attorney when his statement was taken they probably would bring in a verdict of first degree murder. Appellant argues that, realizing the People's case rested mainly on the prosecution's convincing the jury that those things in appellant's statement indicating a deliberate killing were the truth and that mitigating and excusatory matters testified to by appellant on direct were a fabrication, the prosecution set out deliberately to destroy, in the eyes of

the jury, the good faith and credibility and veracity of appellant.

At the outset of the cross-examination the following occurred: "By Mr. Leonard: Q. You sit down, Mr. Jones, I've got a few questions myself. Now, Mr. Jones, as I understand it, you told this Jury here you had never been in any kind of trouble? A. Never have in my life. Q. Never been arrested? A. Not in my life. Q. Never had anything to do with the police before? A. Never had, no, sir, never had. (Mr. Leonard shows counsel a sheet of paper.) Q. Isn't it a fact, Mr. Jones, that on February 19th, 1931 you were arrested on suspicion in Middleton, Texas? A. Middleton, Texas? Q. Yes. A. Never been in Middleton, Texas. Q. So the files of the Federal Bureau of Investigation of the United States are in error, is that correct? A. I never been in Middleton, Texas. Q. In other words, you deny the records of the F.B.I. are correct? Mr. King (of counsel for appellant): I object to that—— The Witness: (Int) I don't know where Middleton, Texas is at. Mr. King: He denied he had been in Middleton, Texas. Mr. Leonard: We offer the record of the United States Department of Justice, Federal Bureau of Investigation, in evidence, Your Honor. Mr. King: We object, Your Honor, there are millions of Joneses in the United States, probably a half a million of Will Joneses, he's got a paper that says some Will Jones was arrested in Middleton, Texas. Mr. Leonard: Counsel well knows these records are prepared from fingerprints. Mr. King: If this is going to be argued I would like it to be argued out of the hearing of the Jury. Counsel well knows he can't offer a paper like this. Mr. Leonard: It has been—— Mr. King: (Int) I cite the conduct of the District Attorney as misconduct in the presence of the Jury. Mr. Leonard: You wish to argue the point? Mr. King: Not here. I also wish to call to the Court's attention after approximately eight years in office Mr. Leonard knows better than that. The Court: Well, it would appear unless something further substantial—— Mr. Leonard: (Int) We will have to get a certified copy of it, Counsel. Mr. King: May I ask this Counsel, how long you have had that paper? Mr. Leonard: Given to me about ten minutes ago. Q. In any event, you deny you were ever in jail in Middleton, Texas, is that correct? A. Yes, I don't even know where it is at, I never been in jail there, I don't even know where Middleton, Texas is at."

The document was not identified and forms no part of the

record. It was not, so far as the record shows, preserved in the files of the cause and counsel for appellant argues here that this occurred because the prosecuting attorney knew it did not in anywise measure up to his intimations as to its contents, for instance, the intimation that it bore fingerprint proof that the Will Jones said to be mentioned therein as having been once arrested in Middleton, Texas, some 24 years before appellant killed Mrs. Bivens, was appellant; that, therefore, appellant was asserting that the files of the Federal Bureau of Investigation of the United States were in error; that he had presumed to "deny the records of the F.B.I." The prosecuting attorney then cross-examined fully, aiming his cross-examination at developing the inconsistencies between the extrajudicial statement and the direct testimony of appellant. For example, the following occurred: "Q. You remember you told me you were going to tell me the truth, is that right? A. That is right, I am going to tell you the truth. Q. Did you tell me the truth that day? A. Sure I told you the truth. Q. You told me the truth that day? A. I did. Q. Do you remember telling me, Mr. Jones, that you took the gun away from Marguerite and that you were standing there and that you had the gun then and she didn't, you remember that? A. Yes. Q. And you remember telling me she was talking to you but you didn't remember what she told you, you remember that? A. I kind of remember something like that. Q. Was that true? A. I am trying to get my mind on that now. Q. And you remember you told me you took the gun and aimed it at her and shot her and she fell on the floor, you remember telling me that? A. Did I tell you that? Q. Do you remember telling me that? A. I am trying to get my mind together, I don't know, I don't want to say I didn't tell you, and I don't want to say I did. Q. Your memory was lots better the day after the shooting than it is now several months later? A. Oh, I guess it is. Q. So what you told me the day after this shooting, the whole thing was really fresh in your memory, wasn't it? A. Well, it seems like it was—it would be, that is right. Q. Line 8 of this statement, or page 8, line 18, you remember my asking you these questions and you giving me these answers, Mr. Jones, 'Ques. Well, you didn't decide to kill her until after you got the gun away from her? Ans. No, I wasn't thinking about it, I was going to get up and leave. Ques. And then you aimed the gun at her and you shot her and she fell to the floor? Ans. Yes I aimed and shot as soon as I got it and she

fell.' That is what happened, wasn't it? A. Well, I am trying to get my mind on that, I didn't want to tell you that, I was so upset, I don't know what I told you, I could have told you with my mind upset. Q. I am pointing this out, this is the information you gave me the next day, the day after the shooting, you recall that? A. I am trying to think now. . . . Q. You remember telling him [Mr. Christensen] that you took the gun away from her then you decided to kill her and you shot her the first time and she fell to the floor and you stood over her with the gun, you remember telling him that and you remember she said, 'Fats, don't shoot me no more'? . . . You remember that? A. I am just trying to think, to get my mind on that, I might have said it, I don't remember saying it, I could have, I don't know a thing about it. Q. Well you know it is very important now that you tell these people the truth of how it happened? A. I understand that, I will tell them the truth. Q. Now, let's tell them the truth about what happened? A. I will tell the truth, I will. Q. Then it is true what you told me the very next day that she did come in and she had the gun, didn't she, and she came in with that gun and she pointed it at you, didn't she? A. That's right. Q. And you were scared? A. Yes, I sure was. Q. You weren't mad? A. No, I couldn't get mad, too scared to. Q. All right, then you were sitting in the chair, weren't you? A. That's right. Q. And you got up out of the chair when she came in there, you remember that? A. I get up. Q. And you reached out and you grabbed the gun and you wrenched it out of her hand, you remember that? A. I remember taking the gun from her. Q. That is right, nobody had shot anything as yet? A. Not yet, I don't think. Q. So you took the gun away from her, now then, isn't it true, she was standing there and she was talking or arguing with you, you remember that? A. Yes. Q. And you had the gun in your hand, didn't you? A. That's right. Q. Nobody shot at anything as yet? A. Not yet. Q. So you were arguing with her then and that is when you decided to shoot her, wasn't it? A. Well, must have been, I guess it must have been that way. Q. So you did aim the gun at her and pulled the trigger and shot and she fell to the floor, isn't that true? A. Yes, so far. Q. And after she fell you stood over her, didn't you, you remember she was lying on the floor, and wasn't she lying on her back just like those pictures show, you remember that? A. Yes, I remember, I wasn't standing right over here, I was standing oh,—— Q. That is

right, she was lying down there, wasn't she? A. That's right, she was lying on the floor. Q. You were standing there and you had the pistol in your hand, isn't that right? A. That's right. Q. And you stood there for several seconds, didn't you? A. Well, I don't know how long. Q. It wasn't too long, you stood there for several seconds, isn't that right? A. I stood a few seconds, I know, I don't know how long I stood there. Q. You had already made up your mind to kill her? A. No. Q. You remember telling me? A. I had no mind killing her. Q. You remember you told me the day after the shooting after you took the gun away from her and she was standing there disarmed that is when you made up your mind to kill her, you remember telling me that, you remember you said you were disgusted, you recall that? A. I am trying to think now. Q. Well, it is important now, Will, we get this right? A. Yes. Q. So you remember telling me that? A. You got that down, I guess I told you that. Q. Isn't it the truth? A. Well, I just trying to think, I did say many things, I don't know who I talked to to be frank with you. Q. You remember talking to me, you remember talking to Captain Christensen? A. I didn't know you then like I do now. Q. You know me now? A. I sure do, I didn't know you then but you knowed me. Q. That is right. Well, Will, do you remember this, after she fell to the floor you stood over her a few minutes, you remember that? A. (no reply) Q. Stand up a minute, Will, now you remember you had taken the gun away from her, you wrenched it out of her hand and she was pointing it at you, you remember that? A. Yes. Q. After you did that you shot her and she fell to the floor, you remember that? A. I remember shooting her all right, I don't know that she fell to the floor or not. Q. Don't you remember her falling to the floor? A. I remember her falling, you know, I was nervous, too scared to. Q. But after you fired the first shot she fell to the floor and it was after that you fired the other three shots, wasn't it? A. That's right. . . . Q. Now, will you show the Jury just where you were standing when you shot her the other three times, can you do that, just point your finger at about where you were standing or where the gun was? A. Just about here, (Indicating). . . . . Q. You were about two or three feet away from her, is that right? A. Something like that. Q. And when you shot her those three times you shot her with the idea you were going to kill her, didn't you? A. No. Q. You didn't? A. No. Q. Didn't you tell me you were trying to kill

her? A. I wasn't trying to kill her, I might have told you that, but I wasn't trying to kill her. Q. Why did you shoot her the other three times? A. I don't know, I just got nervous.''

Mr. Lyde, Assistant District Attorney, opened argument for the prosecution. Mr. Leonard closed. After a preliminary opening he said:

''Now let's briefly review some of the factual situation here. You heard conjectures, you heard opinions, you heard explanations, you heard all kinds of things but you haven't heard facts excepting as they appear on this witness stand from the mouths of witnesses that testified in this case. Ladies and Gentlemen, they told you how sorry they are for Will Jones, that poor man, that is one of the people of the State of California. Well, Ladies and Gentlemen, here was another person of the State of California, right here, dead, shot four times. Let me tell you what happened the night of April 30th as has been testified to here, I was called just a few moments after this crime was committed. I went immediately to the murder scene, I opened the door and walked in and this is what I saw, Ladies and Gentlemen, right here. You people weren't there, you didn't see this, well, I did, I saw this, and I said, 'Where is the man that did it?' ''

It is one of appellant's contentions that the foregoing constituted misconduct on the part of the district attorney in that he went outside the record and became an unsworn witness backed with all the prestige of his office and his long service as district attorney.

Appellant contends that the evidence is insufficient to support a conviction for murder of the second degree, and that this Court, if it does not reverse the judgment, should reduce it to a judgment of manslaughter. These contentions cannot be sustained. ▪▪▪ Appellant's statement supplies sufficient support for a finding of second degree murder. Therein appellant stated that when Mrs. Bivens approached with the gun and pointed it at him he wrested it from her and gained control of it before any shot was fired; that he then realized she was unable to harm him and yet determined to kill her; that he then fired one shot, whereupon she fell to the floor; that he fired three times more and that he ceased firing when and because his gun was empty; that he did not know if she were then dead and made no effort to find out nor did he call for aid, but went away, leaving her lying there. It is no help to appellant to recall the version he gave of the killing while

testifying at the trial, which in respect of the matters we have stated, was in conflict therewith. The jury could believe that the killing occurred as he pictured it in his statement and could, coming to that determination, discard even from the statement those parts thereof inconsistent with a killing done after his adversary had been disarmed and following a decision to kill. ■ It is also futile to consider that the version of a deliberate killing does violence to the great portion of the testimony in the cause, for when we address ourselves to the sufficiency of the evidence we are concerned, not with preponderance, however great it may be, but only with substantial support, giving to the jury their right to select from the testimony those parts which they believe to state the truth. ■ In this case the jury could, as it did, hold the defendant to be guilty of murder of the first degree, that is, the jury could have found that the killing was "wilful, deliberate and premeditated" within the meaning of those words as declared in *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8], *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21], *People* v. *Daugherty,* 40 Cal.2d 876 [256 P.2d 911].) ■ In neither a hearing on the motion for new trial nor on appeal "may the court reduce the degree of the crime unless the evidence is legally insufficient to support the higher degree of which defendant was convicted, and in determining that question, the evidence, even if circumstantial, is not weighed." (*People* v. *Daugherty, supra,* p. 884.) ■ The evidence we have referred to is equally sufficient to support a conviction of murder of the second degree. This killing was not done under the special circumstances which section 189 of the Penal Code declares will make the killing first degree murder. And, if the jury were to conclude that the killing lacked the qualities of wilfulness, deliberation and premeditation, there was still support in the evidence for a finding that it was a malicious killing, and that this malice was express in that there was manifested a deliberate intention unlawfully to take life. The jury could likewise have held that even if a deliberate intention were lacking still there was no existing considerable provocation for a killing when, having wrested the gun from decedent, appellant made up his mind to kill her. (Pen. Code, § 188.)

■ Although appellant complains strenuously that the district attorney was most unfair in the taking of his statement and that in truth he so far suggested to appellant the answers he desired touching the elements of wilfulness, delib-

eration, premeditation and malice as to substitute his will and thought for that of appellant, yet an examination of those portions of the statement to which we have referred shows that the manner of its taking will not support these charges. No leading was done and no answers suggested in vital parts of the statement; for instance, the following: "Q. Was she talking to you when she got the pistol? A. She said she would blow my damn brains out and I was scared, . . . Q. Well, did you try to run out the door or anything like that? A. No. Q. Well—— A. (Int) So I grabbed her. . . . Q. Now, did she point the pistol at you? A. Well, she pointed the pistol at me too but I grabbed it and twisted it out of her hand. . . . Q. You were getting up when she was going for the pistol? A. And she hit me right here (Indicating), I sure enough felt it and I grabbed the pistol out of her hand. . . . Q. Did she say anything like, 'Don't shoot'? A. After I shot her the first time and she fell on the floor. . . . Q. Did you do that all in one motion or did you get the gun out of her hand and then think it over and then decide you were going to kill her and then aim the gun at her and then—— A. (Int) No, when I got the gun I shot it, when I twisted it out of her hand I shot her." The statement, while giving indication of answer suggestion, particularly on the subjective matter of appellant's forming of the intent to kill, nevertheless cannot be disregarded nor held to be so unfair on the whole that the jury could not conclude reasonably that what actually occurred here was just what the appellant, without either leading or suggestion, said did occur, that is, a killing after need for self-defense had passed and he had emerged a victor in the tussle for the gun, accompanied by his realization that he was no longer in danger and yet wanted to kill. The jury were fully and properly instructed on the subject of the degrees of murder, of the crime of manslaughter, and of self-defense, of the approved meaning of the term "wilful, deliberate and premeditated," also of the definition of second degree murder, including the essential ingredient of malice and how it could be proven. We cannot agree with the trial court that the first degree verdict brought in by the jury lacks substantial support, but as we have said the People have not appealed from the order of the court modifying the verdict by reducing the degree to second.

Appellant contends that the trial court erred in refusing to permit him to show that on prior occasions Mrs. Bivens had told him she had once served a term in prison for assault with

a deadly weapon. Such a statement could well have been material as a part of the whole situation, building up in him a reasonable fear that she would kill him when she rushed from the scene of their bitter quarrel, took the gun from her bureau drawer and advanced to the defendant with it. The State itself proved by Mrs. Beasley that decedent did this, and there is little doubt that she then threatened to kill him. A defendant charged with murder is permitted only one plea (we are not here concerned with the plea of insanity) and under that plea he could show self-defense. Aside from selected portions of his statement to the district attorney and certain conflicts appearing in his direct testimony when with that statement before him the district attorney was cross-examining, the appellant had shown a situation by his own testimony consistent with the State's witness, Mrs. Beasley, of such strength that the jury could reasonably believe that in all that he did after decedent aimed the gun at him he was seized with such passion of fear as to be justified in killing in self-defense, or, leaving self-defense, in killing in the heat of passion so that his crime was manslaughter and not murder. In short, it may be said, if this jury believed appellant's direct testimony of the occurrence, they could not reasonably find him guilty of any crime exceeding manslaughter. Now, it was important to him that he be permitted to show in evidence whatever reasonably bore upon the existence and the extent of his fear. If on several occasions decedent had told him that she had been in prison for assault with a deadly weapon, the jury could conclude that his knowledge of these statements made to him by her could measurably increase his fear and his belief that she was capable of doing what he said she said she would do, to wit, blow his brains out. In this aspect, that she had so spoken to him was a fact which bore upon material issues and could not be excluded. (*People* v. *Soules,* 41 Cal.App.2d 298, 308 [106 P.2d 639].)

■ Appellant contends that the trial court erred in refusing to give to the jury an instruction to the effect that if the evidence was susceptible of two constructions, each of which appeared to be reasonable, one pointing to guilt and the other to innocence, it was the jury's duty to adopt the innocent construction. There was no error in rejecting this instruction in view of the fact that the court had already instructed on the presumption of innocence, on the doctrine of reasonable doubt and also on the proper way to evaluate

circumstantial evidence. The requested instruction was proper enough, but it was unnecessary. It is much weaker than the usual instruction on the presumption of innocence and reasonable doubt, both of which are addressed to the same general subject, that is, the burden of proof and the degree of persuasion which the jury are to require of the People as a condition to a verdict of guilty. (Wigmore, 3d ed., § 2511, p. 407.) The jury having been told that as to each and every essential element of guilt the State must persuade them to a moral certainty and beyond all reasonable doubt, nothing would be added by the requested instruction, that if there be two reasonable hypotheses that favoring innocence is to be preferred.

At the close of the evidence counsel for the appellant asked the trial court to defer argument until the next day, basing their request upon a contention that the trial had been long and exhausting, that they wanted time to organize, formulate, and divide the burden of argument and that, although a daily transcript had been furnished them, there was no transcript of the evidence taken the last day, which transcript they also needed in order to perfect their arguments. The arguments did not begin until 3 o'clock in the afternoon, the opening argument for the prosecution consuming about an hour, so counsel for the defendant could not be heard until around 4 o'clock in the afternoon. The court had been in session from 10 o'clock in the morning. Considerable testimony had been taken in the morning hours and the court had instructed the jury in advance of arguments. There is nothing in the record that shows the trial court to have abused its discretion in thus controlling the proceedings of the trial. The statute places the burden of such control upon the trial judge and commits all such matters to his discretion. (Pen. Code, § 1044.) ▆▆ And it would require a strong showing of prejudice, wholly absent from this record, to justify a reversal on the ground that the trial court had abused its discretion by refusing to defer argument.

▆▆ Appellant contends that the district attorney in his closing argument was permitted to testify. If the charge were true it would, of course, present a grave question of error. But the record does not bear out the charge. After a preliminary opening the district attorney said: "Let me tell you what happened the night of April 30th as has been testified to here, I was called just a few moments after this crime was committed. I went immediately to the murder

scene, I opened the door and walked in and this is what I saw, Ladies and Gentlemen, right here. You people weren't there, you didn't see this, well, I did, I saw this, and I said, 'Where is the man that did it?' He was loose out in the night someplace with a gun and that is all we knew. . . .'' The record does not show that the district attorney elaborated on his statement "this is what I saw." There were numerous pictures that had been taken showing the room in which the killing had occurred and showing the body of decedent as it lay on the floor. Apparently it was to the scene as thus recorded in the pictures that the district attorney referred. At any rate, he did not go further. We think the portion of the argument objected to shows that the charge that he was testifying is not true.

■ Appellant contends that the district attorney was guilty of prejudicial misconduct meriting reversal of the judgment in his cross-examination touching the past record of appellant. We think there is no doubt that the district attorney went beyond permissible bounds in the conduct complained of. We have heretofore quoted that portion of the transcript which shows this occurrence. From the statement of the district attorney it appears that some 10 minutes before he began to cross-examine appellant at the close of appellant's direct testimony he had been handed a sheet of paper, generally referred to as a "rap sheet." It was not certified nor authenticated in such a way that it could be introduced in evidence. It was not introduced in evidence, and, although offered, it was not made a part of the record so that we can only surmise what its contents were from the things said about it between counsel during the cross-examination with reference to it. Defendant had stated on direct that he had a clean record and, as we have said, the cross-examination took place at the close of his direct testimony when it was apparent that if the jury believed he told the truth it was highly improbable that a verdict finding him guilty of a crime higher than manslaughter would be brought in and it was quite probable that he would be acquitted. His direct testimony on essential matters particularly having to do with the degree of murder, if murder had been committed, conflicted with his oral testimony. If, in addition to that and to the cross-examination, which of course would be and was based upon those conflicts, his credibility in the eyes of the jury could be destroyed, then the effect of his direct testimony would go along with that destruction. For the district attorney to display before the

jury this unauthenticated document was unfair. But that is too mild a term to apply to the apparent and deliberate misrepresentations to the jury of the contents of that instrument. So far as this record can disclose, and we think what we are about to say is a fair inference, there was no identification of the Will Jones, spoken of in the document as having been arrested on suspicion of some crime 20 odd years before, with appellant, except that of idem sonans. As appellant's counsel remarked, there are many Will Joneses. But when the appellant denied that he had ever been in Middleton, Texas, where the Will Jones mentioned in the "rap sheet" had been picked up, the district attorney made pretense that he was having the temerity to deny the correctness of the records of the Federal Bureau of Investigation of the United States, and when defense counsel pointed to the lack of identification, the district attorney replied that counsel well knew these matters were authenticated by fingerprints. We think we are compelled to assume that this was a deliberate misrepresentation in that the district attorney sought to give, and no doubt did give, to the jury the impression that defendant's fingerprints matched those upon the document he held in his hand. There is nothing in this record to show that the document afforded any fingerprint identification whatever and it is a fair assumption, and we think a compelled assumption, that it did not. By this time the damage had been done and the district attorney, having accomplished his evident purpose, feebly stated to the court that, since the document was not certified, it was not admissible in evidence and it disappeared from the case. But its effect must have remained. As the district attorney was quick to say in argument, he had for eight years been district attorney of the people of that county and he had always been fair with every defendant whom he tried for crime. No doubt the jury believed that; no doubt also they believed that Will Jones had lied when he said he had not been in Middleton, Texas, even though confronted with the irrefragable proof of the purported record of the F.B.I. replete with fingerprint proof that he had been there, that he had been arrested, and that his record had not been the clean record he swore to the jury he had. This episode was followed by vigorous cross-examination based upon the discrepancies between the direct testimony of appellant and his statement. This part of the cross-examination was legitimate. The conflicts were there and comment based on a comparison of the statement

with the direct testimony was to be expected and was proper. But it may well have been that the effects of these conflicts were greatly magnified by the misconduct of which the district attorney had been guilty at the beginning of the cross-examination.

Before a judgment of conviction can be reversed it must be made to appear from the record that to reverse it would not be a violation of the constitutional admonition contained in article VI, section 4½. This always calls for an evaluation based on the whole record of any errors appearing therein and of any misconduct shown therein on the part of the prosecuting attorneys. There appears to be no doubt in this case that the evaluation of the mentality of defendant as given by the court-appointed expert who examined him was true. He was an illiterate man with mental equipment far below normal; just the type who under the force of suggestion would answer in the way he did questions having to do with his own mental reactions, although it is most probable that in view of the circumstances under which this killing took place there was little chance for him to remember what his mental reactions were. Both his testimony and that of the State's witness, Mrs. Beasley, amount to most persuasive, if not conclusive, proof that Mrs. Bivens, the decedent, was the aggressor throughout, until she was disarmed by appellant after a struggle for the possession of the gun. There is no reason to doubt the truth of the defendant's statements that he was extremely frightened when this angry woman rushed into her bedroom, pulled open her bureau drawer, took out, unwrapped and prepared for action the gun she had concealed there and went in to confront defendant with it. A much better organized mentality than that possessed by defendant would have been prevented from functioning by what the decedent did. It is difficult, indeed, to believe that there was or could have been under such circumstances a deliberation and premeditation antedating the intent to kill, that the appellant did weigh and consider, or could have weighed and considered, the question of killing, and the reasons for and against the choice to kill, with the consequences in mind, or that, having done so, he could decide to commit the unlawful act causing death. (*People* v. *Thomas*, 25 Cal.2d 880, 898 [156 P.2d 7].) The jury were told that, before they could find him guilty of first degree murder, they must be satisfied that such had been the operations of his mind. We revert to the testimony of Mrs. Beasley,

who, for the State, said that she fled the scene fearing that "something bad" was about to happen when she saw Mrs. Bivens take the gun from the bureau drawer and start toward the defendant with it, and who said that as she hurried away, having only gone a distance of perhaps 40 feet, she heard the first shot. We revert also to the condition of the room in which the killing took place, showing without reasonable ground for doubt that a struggle for the gun had taken place. For this jury, under those circumstances and subject to those instructions, to have found this to be first degree murder argues that there was something more than the conflict between the defendant's testimony and his extrajudicial statement that influenced them against him, and when we add to the prejudicial misconduct we have been discussing the error of the trial court in refusing to allow the defendant to offer proof that Mrs. Bivens herself had frequently told him she had been convicted and had served time for assault with a deadly weapon as part and parcel of his proof that he did in fact fear death, we cannot affirm the judgment appealed from.

For the reasons given, the judgment is reversed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied October 27, 1955, and respondent's petition for a hearing by the Supreme Court was denied November 9, 1955. Shenk, J., and Edmonds, J., were of the opinion that the petition should be granted.