[Crim. No. 1978.   Third Dist.   Jan. 8, 1947.]

THE PEOPLE, Respondent, v. ELLA PRATT, Appellant.

Chester Monette for Appellant.

Robert W. Kenny, Attorney General, and James O. Reavis, Deputy Attorney General, for Respondent.

PEEK, J.—By an information filed by the District Attorney of Humboldt County defendant was charged with the

crime of murder, to which she pleaded not guilty. At the conclusion of the trial the jury found her guilty of manslaughter. Her motion for a new trial was denied and she was sentenced to the state prison for women at Tehachapi. She thereafter appealed to this court from an order denying said motion and from the judgment, contending (1) that the evidence was insufficient to sustain the verdict and judgment, (2) that the court erred in matters of law, and (3) that the district attorney was guilty of prejudicial misconduct.

The record, viewed in the light most favorable to the respondent (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]), discloses that defendant and deceased were respectively the past and present mistresses of one Edward Brown, the complaining witness; that on Monday, February 25, 1946, while defendant and her mother were returning from the town of Trinidad in Humboldt County and at a place referred to generally throughout the transcript as the "Forks of the Road" they met deceased and another woman. According to the testimony of the defendant, the four women thereupon set out upon a round of drinking, consuming wine and beer to such an extent that two of the participants lost consciousness. From time to time during the afternoon they were joined by other friends, both men and women, who likewise partook of beer and wine. About six o'clock p.m. defendant and decedent, each taking a bottle of wine, proceeded to the home of defendant's father where more wine was consumed and defendant changed her clothes preparatory to going to the city of Eureka. On their way back to the "Forks of the Road" deceased became increasingly intoxicated. She sat down and promptly went to sleep. When she awoke a discussion arose concerning a child born to defendant while living with Brown, which child subsequently died while defendant was confined in a hospital and the child was in the custody of Brown, who was then living with the deceased. When defendant demanded the details of the child's death deceased became reticent and in effect accused defendant of bringing her there to kill her. Upon deceased's refusal to answer, defendant struck her repeatedly in the face with her fists and choked her. Deceased, whom defendant stated was more intoxicated than she, was the elder and smaller of the two, and made no attempt to fight back or resist, but begged defendant to stop beating her. Defendant felt blood on her hands and, thinking deceased had

"had enough," left deceased (who was then conscious) lying on the ground and returned to her friends at the "Forks of the Road." She left behind the bottle of wine from which they had been drinking and took with her, in her purse, the other bottle. To her friends she related what had happened and how she had given deceased a sound beating. While more wine was being consumed, two of the members of the group left saying they were going to see where deceased was. They returned shortly—but in defendant's belief too soon to have walked to the scene of the beating and back—and declared that deceased was all right. About nine o'clock p.m. defendant left the others and flagged an automobile ride to Eureka where she arrived an hour later, after having partaken of additional liquor furnished by the driver of the car. In Eureka she joined a friend at a cafe and drank with her until midnight. The remainder of the night was spent in a cabin with a former brother-in-law. At approximately three o'clock the following afternoon (Tuesday), after having visited various bars during the intervening period, she was met by the prosecuting witness, Brown, who inquired as to the whereabouts of decedent. She told him about her "misunderstanding" with the deceased concerning the baby, and said he could find deceased where she had left her.

On cross-examination defendant testified that she did not strike deceased with the bottle at any time, although she did not appear to be positive about it and admitted that she might have told police officers that she had done so.

The prosecuting witness Brown testified that the last time he saw deceased was the evening of Sunday, February 24th, at the home of a friend where she was staying. He testified further that on the afternoon of February 26th he found defendant at a drinking place in Eureka, and when he asked her what she did with deceased she replied, "I got into an argument with her and beat her up," and that he would be able to "... find her right where I left her." The witness testified further that he then went to the sheriff's office and later accompanied the officers who went to the scene of the tragedy. On cross-examination he admitted that he was living with the deceased as man and wife although he knew she was married, and also that he had been convicted and had served a penitentiary sentence for assault with a deadly weapon.

The decedent when found was lying on her back, her hands folded across her breast. Her slacks were off and lying over

her legs. Her face was swollen and bruised, and, according to the coroner and an autopsy surgeon, death was caused by a blow or blows on the head, although these witnesses were not in entire agreement as to whether it was a blunt or sharp instrument that inflicted the fatal wounds. However, both of them testified to the lacerated and bruised condition of the body, and the swollen appearance of the victim's face.

One Zuver, a truck driver employed by the State Highway Department, testified that on February 26th, at approximately 8:30 o'clock a.m., he first noticed deceased lying on her back at the side of the road at a place which corresponded with the one where the evidence showed the beating had occurred; that he passed the spot at thirty or forty minute intervals throughout the day; that he observed her time and again, and last saw her at approximately 3:30 o'clock in the afternoon; that it was raining all the time but he could see her face well enough to identify her; that her face and particularly her cheek seemed swollen, and that on his last trip he noticed that she had moved from her original position a distance of approximately three feet.

J. A. Morasco, a witness for respondent, stated that while returning to his home Monday evening, February 25th, he noticed deceased and defendant sitting near the side of the road, and that at approximately five o'clock the following morning, while walking along the road on his way to work, he heard a groan coming from the spot where he had seen the two women the day before, and turning on his flashlight he saw deceased lying on the ground, obviously badly hurt. His further testimony was: "I stopped and asked: 'Who beat the hell out of you?' . . . And so . . . She says 'Ella,' So I walked on about my business, and I got to the turn of the road. After I got to the turn of the road I heard a voice, says, 'Help please.' So I still kept going, got in the car, and went to my job. The following evening, on my way back, I met the Sheriff there and found out the lady was dead."

Leo Sullivan, county detective, testified that he found a broken wine bottle at the scene which appeared to have blood on it in addition to mud; that on lifting one of the many rocks lying about the place he noticed what appeared to be blood on the lower surface; and that no chemical test was made to establish the fact that the substance on the bottle and rock was blood, nor was any attempt made to get fingerprints.

Sheriff Ross testified, among other things, to the blood-soaked appearance of the ground where the body was lying, stating that the rocks buried in the mud at that place appeared to be stained with blood. He explained that the reason he did not make tests or take fingerprints was that he presumed from the fact that defendant had admitted that she had blood on her hands and that she had been drinking from the bottle she left there that it would be her fingerprints, if any, that would be found on the neck of the shattered bottle and that the foreign substance thereon would be the blood of deceased.

Other witnesses testified to seeing the deceased at the side of the road both before and after the beating. One of them stated that as she and her husband drove by in their car, it seemed as though the larger woman who was in a sitting position was trying to hide from view the face of the woman lying close to her, covering it quickly with her hands as the car went by.

Even though we were to give serious consideration to the summary of the evidence by appellant, which she contends is not sufficient to sustain the verdict, nevertheless " '. . . *We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury.*" [Italics added.] (*People* v. *Newland, supra,* at page 681.)

Applying this well established rule to the record in the present case we find evidence showing two women fully aware of their relationship with the prosecuting witness Brown —the defendant being the one supplanted in his present affections by the deceased; the death of defendant's child while in his custody and while he and deceased were living together; the admission by defendant that she administered a severe beating to deceased who was older and smaller than herself and in addition so intoxicated she made no defense; the further admission of defendant that as a result of the beating she administered she had blood on her hands; the admitted possession of a bottle of wine at the place where the beating occurred and the subsequent finding there of a shattered wine

bottle which had on it a substance resembling blood; the fact that a rock was found at the scene which likewise had the same substance upon it; the statement made by defendant to Brown the following day "You will find her where I left her";—these and other circumstances which the evidence discloses are such that we cannot say as a matter of law that the jury was not warranted in finding as it did or that the trial court was in error in refusing to grant a new trial. (See *People* v. *Neary*, 104 Cal. 373, 380-381 [37 P.943].)

The second assertion of error relates to the admission in evidence of the declaration of deceased accusing defendant of having beaten her, as testified to by the witness Morasco, who stopped when he heard the groans of deceased, but who continued on when she asked for help. It appears that the trial court first overruled defendant's objection to this testimony, but subsequently, and at the request of the district attorney, admonished the jury to disregard it. Even assuming that the declaration of the deceased was not admissible as a dying declaration, the reception thereof in evidence could not be deemed prejudicial in view of the fact that the defendant herself admitted that she had beaten deceased with her hands until she felt blood upon them. The rule is well established that "Error in the admission of evidence is harmless if . . . the fact is proved by the defendant himself." (8 Cal. Jur., pp. 615-616, § 599.) Since the only statement attributed to the deceased and testified to by said witness which properly could be characterized as hearsay was the declaration that it was "Ella" who "beat the hell out of" her, it is apparent that under the rule above quoted defendant has not suffered any injury by reason of the admission in evidence of said testimony. The case of *People* v. *Salaz*, 66 Cal.App. 173, 183-185 [225 P. 777], which defendant cites in support of her argument on this point, involves an entirely different factual situation as well as an entirely different principle of law. There the testimony admitted over objection was the opinion of an autopsy surgeon as to a fact which under no conceivable theory was a matter for expert opinion. It was not a fact which defendant had himself admitted by his own testimony, nor had it been otherwise proven. Moreover, in the Salaz case the proof on the part of the prosecution tended to show that the act of appellant was justifiable, and the question of the sufficiency of the evidence was a very close one. Under such

circumstances, the error could properly be deemed harmful. As has been shown, such is not the situation in the present case.

Defendant also assigns as error the conduct of the district attorney during his cross-examination of the defendant in using the word ''unmercifully'' to describe the manner in which the deceased was beaten by her. Without implying that there was any impropriety in this respect, we need only point out that, while the court did not rule upon the objection interposed by defense counsel to the form of the question, nevertheless in view of the fact that no determined effort was made to procure a ruling on the objection and no motion was made to strike the testimony given in response to the question, and in view of the further fact that as far as the record discloses the failure of the court to make a ruling was not made a ground for the motion for a new trial, the defendant must be deemed to have waived any error in this regard. (8 Cal.Jur. pp. 501-502, § 516; *People* v. *Westlake*, 62 Cal. 303, 308-309.)

It is the further contention of appellant that the district attorney improperly withheld evidence when he failed to introduce into evidence a statement given by defendant on the day she was arrested. Apparently the statement which was introduced was one taken a day later. In response to a motion made by counsel for defendant calling upon the district attorney to produce the prior statement, the trial court observed that it had ''no control over the manner in which the prosecution presents its case . . . he may never introduce it in evidence, for all the court knows.'' Likewise, we know of no rule which requires a prosecuting attorney to introduce such evidence if he does not see fit to do so. (See 8 Cal.Jur., p. 105, § 198.)

Finally, defendant assigns as reversible error two statements made by the prosecuting attorney in his closing argument to the jury. The first, which counsel charges was an ''appeal to the passion of the jury, which no doubt defendant would not have been convicted if omitted,'' relates to the use of certain language including the following: ''Some centuries ago, if I were killed, my brothers, my uncles, various kinfolk, would swear a blood purge to go out and get the man that killed me, and there was a lot of killings, interfamily killings, and tribal . . . and his (the district attorney's) duty is to see you sleep safely at night, and your skull is not crushed.''

In support of this contention defendant cites *People* v. *Newman*, 113 Cal.App. 679 [298 P. 1044]. But that was a case where the misconduct of the prosecuting attorney was extensive and persistent, appearing on at least twenty different occasions and directed unremittingly at racial and religious prejudices, and in addition culminated in a gratuitous and unwarranted attack on the efficiency and integrity of courts of justice. Rather, the situation in the present case resembles that in *People* v. *Frost*, 37 Cal.App. 120, 123 [174 P. 106], where an Indian woman was being prosecuted for homicide and the appellate court held that the somewhat intemperate language of the district attorney in his argument to the jury, in which he declared that if she were acquitted she would go back and kill another man, did not in itself amount to prejudicial misconduct.

The general rule that "Courts are strongly inclined against setting aside convictions upon the ground of misconduct of district attorneys ·alone" (8 Cal.Jur., pp. 620-621, § 602), merits application in the present case. We are unable to attribute to such remarks the effect which defendant gives to them. How the verdict of the jury or the action of the trial court in denying the motion for a new trial could have been or was controlled or affected thereby is not pointed out, and it is hardly conceivable that the language in question could have swayed the minds of jury or judge. Furthermore, the evidence clearly supports a conviction, and from an examination of the entire record it does not appear that the conduct complained of resulted in a miscarriage of justice. (See 4 Cal. Jur. 10-Yr.Supp., pp. 1007-1008, § 602, and cases cited.)

The other particular in which defendant charges the prosecuting attorney with prejudicial misconduct is in that portion of his argument to the jury wherein he sought to excuse the failure of the prosecution to secure and place before the jury fingerprints evidence, stating in the form of a fact that which was obviously merely his opinion regarding the impossibility of procuring a good fingerprint from objects with smooth surfaces which have been outdoors for a long time and exposed to a drenching rain.

In view of the careful instructions which the trial court gave the jury covering just such a statement as the one attacked, it is not reasonable to suppose that the jury could have been misled or otherwise influenced by said statement. Thus, one of the instructions declared: "The Court cautions

you to distinguish carefully between the facts testified to by the witnesses and the statements made by the attorneys in their arguments, as to what facts have been proved; and, if there is a variance between the two, you must, in arriving at your verdict, to the extent that there may be such variance, consider only the facts testified to by the witnesses; and you are to remember that statements of counsel in their arguments are not evidence in the case.''

The prosecuting attorney, in addition to making the statement in question, did not purport to state any incriminating fact, but merely to rebut the inference which defendant's counsel may have drawn from the fact that fingerprints were not introduced in evidence. (See *People* v. *McRoberts*, 1 Cal.App. 25, 27-28 [81 P. 734].)

The judgment and the order denying a motion for new trial are affirmed.

Adams, P. J., and Thompson, J., concurred.