THE PEOPLE, Plaintiff and Respondent, v. DOVIE CARL MATHIS, Defendant and Appellant.

Samuel D. O'Brien, under appointment by the Supreme Court, and Donald M. Layne for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

MOSK, J.—This is an automatic appeal under Penal Code section 1239, subdivision (b), from judgments pursuant to verdicts finding appellant Dovie Carl Mathis guilty of murder in the first degree and robbery in the first degree and fixing the penalty at death. The trial court denied appellant's motions for a new trial and for reduction of the penalty. Codefendant Billy Still was also convicted of the murder and robbery at the same trial but received a sentence of life imprisonment.

The two defendants were convicted of killing Vernon Ray in the process of robbing him of approximately $600 which he had on his person. The events took place on the evening of Saturday, October 19, 1963, and the early morning hours of Sunday, October 20, 1963, after Ray had displayed a large amount of cash in the presence of a waitress at Fisher's bar in San Jose. Ray had been in the bar early Saturday evening and had left shortly before 8 p.m.

Bill Still arrived at Fisher's bar sometime during the evening after Ray had left, and heard tales of the money from the waitress. Mathis arrived later, and Still recounted the story to him, calling upon the waitress to confirm it. Testimony was offered which established that both defendants were in financial straits that evening.

Sometime after midnight Mathis proposed that the two leave the bar. He then drove Still to the home of his sister in San Jose where they admitted themselves with Mathis's key and telephoned Ray. Mathis told Ray that his car was stuck in the mud in Alum Rock Park, in San Jose, and asked Ray to drive to the park and pull him out with his pickup truck. Ray agreeably consented and, upon informing his wife and guests of his intentions, left his home about 1:30 a.m.

Mathis and Still then drove to Alum Rock Park, positioned their automobile off the road and waited for Ray who arrived momentarily. Mathis, meanwhile, had instructed Still to take the revolver he had in his car and hit Ray over the head with it at an appropriate moment. Still objected to the use of the revolver, so Mathis then proposed that Still use a tire wrench which he obtained from the trunk of his car. Still took the wrench and hid in the bushes nearby.

When Ray arrived he backed his truck to the Mathis car, connected a line between the two vehicles, and attempted to tow the car. Mathis, however, placed his foot on the brake of his car to create the impression that the car was stuck. He eventually released the brake allowing Ray to pull the car free, whereupon Ray got out of his truck and proceeded to release the cable. At that moment, as Ray was bent over the towline, Still crept up from behind and hit him over the head with the tire iron. Ray was stunned, but not unconscious, and fled to a nearby creekbed. Mathis and Still chased him, and Mathis caught him at a point a quarter of a mile up the creek. A scuffle ensued during which Mathis knocked Ray unconscious with a large rock. He then told Still to get the money from Ray's pocket, and this Still did. Mathis then administered the coup de grace by striking several frontal blows to the head of the supine victim with either the same or another large rock.

The two then departed from the scene, Still driving Ray's truck, using a pair of gloves furnished by Mathis, and Mathis driving his own car. Mathis returned to the apartment in East Palo Alto where he lived with a young woman named Kathy Taylor, arriving about 3 a.m. He complained of an in-

jured thumb, telling Kathy that he had been in a fight and that if anyone inquired she was to say that he had been home since 8 p.m. that evening.

Mathis and Still met on Sunday morning and disposed of the clothes they had worn the previous night by throwing them into the bay. About 3 p.m. Sunday, Mathis was arrested by San Mateo County sheriff's deputies and taken to the Redwood City jail where San Jose police officers questioned him. Mathis told them he had been home all night, and Kathy confirmed his story. He was then taken to San Jose for further questioning until about 11 p.m., when he was allowed to sleep. At the time he was arrested Mathis's thumb appeared to be split, but he had no other serious injuries. He told officers that he had caught his thumb in the door of his car.

On Monday morning the interrogation resumed about 8:30 a.m. and Mathis continued to deny all, even when told that Kathy had changed her story and had admitted that he had not returned home until 3 a.m. During the course of the interrogation Monday morning Mathis requested to see his attorney. He was then being represented by Cyril Ash, a San Jose attorney, in another criminal matter. The officers attempted to telephone Ash, but his line was busy. The questioning continued.

At 11 a.m. Monday, Still was arrested and immediately gave a complete statement to the police implicating Mathis as the major perpetrator of the crime. Confronted with the evidence the police now possessed, Mathis again requested to see his attorney and again the police placed a call to Ash's office, this time reaching his secretary who told them the attorney was in court. The officer left word for Ash to call the police department in regard to a client who wished to see him. Following this call Mathis agreed "to tell the truth," and a recorded statement was taken from him. That statement was later introduced at the trial.

The statement which Mathis gave, however, was neither a confession nor the truth. It was an attempt to absolve himself from both the robbery and the murder by casting suspicion upon a third individual. Mathis told the police that although he had been in Alum Rock Park and had parked his car off the road as though stuck, he had done so at Still's suggestion; that he had merely accompanied Still at the latter's importuning and had no idea what Still planned to do about Ray's money; that while Ray was hooking up the tow cable, a mysterious stranger appeared from the bushes and, confusing him

with Ray, hit him, Mathis, over the head, rendering him unconscious; that the stranger and Still then robbed and killed Ray. He indicated that the stranger resembled a person named Larry Jones he had seen talking with Still at Fisher's bar.

The police then apprehended Jones, who was held for a brief period and released when his alibi was substantiated. During the remainder of the investigation Mathis gave no further statements, and, during a trip to the scene of the crime with Still, he urged Still not to cooperate with the police, reminding him that he had no duty to do so.

At the trial the recorded statement was used to discredit the appellant's veracity. The prosecution demonstrated that the exculpatory elements of the story were fabrications. Mathis, testifying on his own behalf, admitted enticing Ray into the park, but said it was part of a plan devised with Mrs. Ray to test Ray's fidelity to his wife. He said that he was surprised when Still hit Ray over the head. He denied giving Still the tool and said that Still had disappeared into the bushes as soon as they had parked the car and that he assumed it was because Still needed to relieve himself. According to Mathis, Still did not hit Ray hard enough to knock him unconscious and Ray had then taken the tool from Still and charged after Mathis while uttering oaths about Mathis "playing around" with his wife. Mathis said he ran to the creek where Ray eventually caught up with him. Ray attempted to hit him several times while Mathis protested that he did not want to fight. After warding off several blows Mathis managed to trip Ray, who fell into the creek. Mathis said he then picked up a rock and hit Ray once on the back of the head and then ran from the scene. He said that Still had apparently followed them down to the creek, waited until Mathis hit Ray and ran, and then had taken Ray's money and killed him.

Appellant testified he had given a false statement to the police because he was tired and depressed, wanted to see his lawyer, and thought that if he told a story that brought a new suspect into the investigation he would gain some time and relief from the questioning.

At the penalty phase of the trial the prosecution asked for the death penalty for Mathis but not for Still. Two character witnesses testified to instances of prior violence by Mathis for which he had been convicted. The district attorney stressed that Mathis had tried to implicate an innocent man in this crime.

Appellant urges several grounds for reversing the judg-

ments, including the improper use of the recorded statement given without the aid of counsel. The other contentions relate to alleged misconduct of the district attorney and the damaging testimony of appellant's wife at the penalty trial. Appellant also maintains that color photographs of the victim taken when the body was discovered should not have been admitted into evidence at the trial on the ground that they are inflammatory. Before grappling with the use of appellant's recorded statement, the issue containing the most substance, we shall discuss seriatim appellant's other specifications of error.

The color photographs in this case are indeed gruesome, but the test for admissibility is whether the probative value of the evidence outweighs the inflammatory effect it may have. (*People* v. *Harrison* (1963) 59 Cal.2d 622, 627 [30 Cal.Rptr. 841, 381 P.2d 665] ; *People* v. *Darling* (1962) 58 Cal.2d 15, 21 [22 Cal.Rptr. 484, 372 P.2d 316] ; *People* v. *Brubaker* (1959) 53 Cal.2d 37, 48 [346 P.2d 8] ; *People* v. *Carter* (1957) 48 Cal.2d 737, 751 [312 P.2d 665].)

There was considerable discussion in chambers on this point prior to the court ruling that the probative value outweighed the inflammatory effect. The photographs were used to discredit the self-defense theory by showing that the victim's face had been beaten beyond recognition and that blood and brain matter around the victim's head demonstrated severe blows had been struck after he was supine and had been rendered hors de combat.[1] Appellant does not deny the evidentiary value of the pictures, but objects to the use of color when black-and-white photographs which were available could have served the same purpose. It is difficult for a reviewing court to determine if black-and-white would be less inflammatory than color pictures, but considering the subject matter it appears unlikely that the difference would be significant. Since the pictures unquestionably did have evidentiary value and since the trial court thoughtfully weighed the alternatives before ruling, we do not find an abuse of discretion in admitting the photographs into evidence. We reached a similar conclusion under a comparable factual situation in *People* v. *Modesto* (1963) 59 Cal.2d 722, 733 [31 Cal.Rptr. 225, 382 P.2d 33], reaffirmed in *People* v. *Modesto* (1965) 62 Cal.2d 436, 443 [42 Cal.Rptr. 417, 398 P.2d 753].

---

[1]The prosecution also attempted to develop a mayhem-murder theory and for that purpose further sought to show that one eye of the victim had been put out. But this theory was eliminated from the case when the court refused to give a mayhem instruction.

■ Appellant next contends that the district attorney engaged in prejudicial misconduct at least twice during the bifurcated trial, once in the guilt phase and once in the penalty phase. Both incidents involved the eliciting of otherwise inadmissible testimony from witnesses and both followed objections sustained to the line of inquiry.

The first incident occurred during redirect examination of Mrs. Ray. The district attorney asked questions designed to obtain the date of a letter written by Mrs. Ray which she had been asked to identify during appellant's cross-examination. Mrs. Ray could not remember the date, and the district attorney suggested she might recall it in relation to some event. Mrs. Ray then said ''it was during the time when he was out on bail and—'' at which point defense counsel objected. The court ordered the words stricken and admonished the witness merely to state when the document was written and not to volunteer additional information. The district attorney persisted in trying to elicit some time reference over repeated objections from defense counsel, until Mrs. Ray said, ''but I was trying to say when he shot this girl Kathy.'' At this point defense counsel moved for a mistrial. The court denied the motion, ordered the statement stricken from the record, and admonished the jury to disregard what the witness had said. The district attorney apologized and said he had not expected this answer from the witness. Appellant contends that the error was compounded during the penalty phase when the district attorney dismissed Kathy Taylor who was present as a prospective witness in full view and hearing of the jury after the court had ruled in chambers that her testimony would not be allowed. Defense counsel had requested that the witness be dismissed unobtrusively during a recess.

Taken in context, neither one nor both of these incidents is likely to have prejudiced the outcome. Mrs. Ray's inadvertent reference to the shooting of Kathy Taylor was an isolated incident during the three-week guilt trial. The court properly admonished the jury. The appellant testified that he was at the scene of the crime, that he had been responsible for the victim being there, and that he had struck the victim with a rock. Appellant's case rested on his testimony that he struck Ray in self-defense and did not lure Ray into the park in order to rob him. Evidence of appellant's prior antisocial conduct would have been likely to tip the balance only if the prosecution had weak or no evidence to disprove the defense. Here evidence of appellant's guilt was strong and

convincing. The district attorney demonstrated that appellant needed money on Saturday, October 19, and that on Sunday morning, October 20, he gave Kathy Taylor $51. His explanation at trial of sudden acquisition of money was another fabrication, exposed by effective testimony on rebuttal. On the issue of self-defense, medical evidence and the photographs developed the probable manner in which the victim had been killed. The prosecution also established that appellant had no injuries other than the split thumb when he was arrested, even though he testified that Ray had hit him on the head, back, and leg with the tire iron. Finally, defendant Still's testimony clearly implicated Mathis.

Since both defendants were found guilty of robbery and first degree murder, the jury apparently concluded that they had engaged in a common effort to rob Vernon Ray resulting in his death during the perpetration of the robbery. In addition, the jury knew that appellant was living with Kathy Taylor at the time of the murder and that she originally provided him with an alibi. Her testimony gave no indication of bitterness toward appellant. Therefore, it seems unlikely that the inadvertent remark about the shooting of her had any effect on the jury, nor can we say as a reasonable probability that its omission would have altered the outcome. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Hamilton* (1963) 60 Cal.2d 105, 121 [32 Cal.Rptr. 4, 383 P.2d 412].)

The effect of the ostentatious dismissal of Kathy Taylor prior to the penalty trial does not appear to be substantial error. The prosecution presented two witnesses who testified to prior violent acts of appellant; Kathy Taylor would have testified to another such incident. The testimony of the two witnesses was extremely damaging to appellant and the subtle suggestion that the People could produce yet another victim of appellant's violence does not appear likely to have been the difference between life and death.

The final alleged act of misconduct occurred when the district attorney cross-examined defendant Still's character witnesses during the penalty trial. Each witness was asked if he also knew appellant. Two witnesses answered negatively, one did not answer because the court sustained appellant's objection to the question, and a fourth replied in the affirmative. The district attorney claimed that the questions were proper as a means of testing the witnesses' knowledge of Still since the two defendants were close friends from boyhood.

The questions were proper where, as here, no additional inference was created since the jury was aware of the defendants' close friendship and undoubtedly realized that some of Still's witnesses also knew appellant. Furthermore, defense counsel did not object to the question when posed to the only witness who answered affirmatively.

■ We now reach appellant's contention that it was improper to allow Mrs. Mathis to testify at the penalty phase of the trial because of section 1322 of the Penal Code.[2] ■ There are, however, several exceptions to the rule that one spouse may not testify for or against the other in a criminal action. The basic exception is that either spouse may testify if both consent, thus framing the rule in terms of a privilege. ■ Furthermore, this privilege is a personal right which must be asserted in order to be preserved. In the leading case of *People* v. *Singh* (1920) 182 Cal. 457, 483 [188 P. 987], this court held that a ''spouse who is present in court when the other spouse is offered as a witness and testifies, and who does not object, is presumed to have consented. . . .'' (Accord, *People* v. *Kroeger* (1964) 61 Cal.2d 236, 246 [37 Cal.Rptr. 593, 390 P.2d 369]; *People* v. *Calderon* (1961) 195 Cal.App.2d 576, 579 [15 Cal.Rptr. 874]; *People* v. *Odmann* (1958) 160 Cal.App.2d 693, 696 [325 P.2d 495]; *People* v. *Van Skander* (1937) 20 Cal.App.2d 248, 254 [66 P.2d 1228].) An objection by one spouse to the testimony of the other must be made explicitly and on the proper ground (*People* v. *Singh, supra*), and cannot be raised for the first time on appeal (*People* v. *Kroeger, supra*; *People* v. *Singh, supra.*) ■ In the present case Mrs. Mathis testified and appellant raised no objection to her doing so until this appeal. Under the foregoing authorities we must hold, therefore, that her testimony was properly admitted.

■ We further hold that the testimony would have been admissible even had appellant entered a timely objection. We are here concerned with a proceeding conducted in accordance with Penal Code section 190.1 to determine penalty following conviction of a crime punishable by death. The stated purpose of section 190.1 is to permit the introduction of evidence ''of the circumstances surrounding the crime, of the defendant's

[2] Section 1322 provides in relevant part: ''Neither husband nor wife is a competent witness for or against the other in a criminal action or proceeding to which one or both are parties, except with the consent of both, or in case of criminal actions or proceedings for a crime committed by one against the person or property of the other, . . . or in cases of criminal violence upon one by the other. . . .''

background and history, and of any facts in aggravation or mitigation of the penalty.'' Clearly the testimony offered by Mrs. Mathis is the type of evidence which the Legislature intended that a jury should hear and weigh in fixing the penalty. Mrs. Mathis testified that appellant had physically assaulted her three times, on two occasions cutting her with a knife and once strangling her with an electric cord to the point of unconsciousness. During one of these attacks Mrs. Mathis jumped through a closed window, fearing her husband would take her life. The jury had both the right and the duty to consider this testimony in making its determination, for these are certainly aspects of appellant's background and history which might bear on the appropriate penalty.

The question thus is whether any sufficient reason exists to keep this otherwise relevant evidence from the jury. We shall see that the testimony conforms to the rules of evidence at penalty trials which this court has adopted for the guidance of trial courts in applying section 190.1. The only remaining objection then would be that the testimony cannot be admitted without creating a direct conflict with the terms of section 1322. We hold, for the reasons hereinafter developed, that there is no conflict with section 1322 because exclusion of the testimony would serve no purpose promoted by that section.

At present, some types of evidence which would be inadmissible at the guilt phase of a trial are permitted at the penalty phase. As this court stated shortly after section 190.1 was enacted, ''It would appear that the new section embodies the broad, liberal rule on admission of evidence that has always existed where a defendant has pleaded guilty and the only issues being tried relate to the degree of the crime and penalty to be imposed.'' (*People* v. *Jones* (1959) 52 Cal.2d 636, 647 [343 P.2d 577]; see also *People* v. *Terry* (1964) 61 Cal.2d 137, 143 [37 Cal.Rptr. 605, 390 P.2d 381].) Under this view, ''We have likewise sanctioned the introduction of testimony of criminal acts not necessarily related to the crime for which the defendant was being tried.'' (*People* v. *Terry* (1964) *supra*, 61 Cal.2d 137, 143-144.) Evidence of such acts may be introduced if it meets the rules of admissibility governing proof of the crimes in question. (*People* v. *Purvis* (1961) 56 Cal.2d 93, 97 [13 Cal.Rptr. 801, 362 P.2d 713].) Since the testimony of Mrs. Mathis would have been admissible under the provisions of section 1322 at a trial for the acts to which she testified, it was admissible at this penalty trial.

Nevertheless, the question remains whether a literal reading of section 1322 requires us to limit testimony of one spouse as to criminal acts committed upon him or her by the other spouse, to an actual trial for those acts. To the contrary, we conclude that the penalty trial is a proceeding where the exceptions enumerated in section 1322 may be found applicable. We so hold because no other solution provides an adequate function and purpose for both code sections here under consideration.

Section 1322 is not so precisely worded as to allow easy judicial interpretation. It contains, for example, two separate clauses which appear to create the same exception in cases of acts of criminal violence committed by one spouse upon the other,[3] although no court has apparently given these two clauses independent meanings (*Marital Privilege*, 8 Stan.L. Rev. (1956) 420, 432). Of course, we do not suggest that by this language the Legislature intended to make provisions governing the penalty phase of a murder trial, since the latter proceeding was not in existence when section 1322 was enacted or last amended. As we have seen, however, a helpful analogy has been drawn between the penalty trial and the proceeding (Pen. Code, § 1192) which is conducted after a general plea of guilty to a crime divided into degrees. (*People* v. *Terry* (1964) *supra,* 61 Cal.2d 137, 143; *People* v. *Jones* (1959) *supra,* 52 Cal.2d 636, 647.) In particular, it has been held that in the latter proceeding testimony of one spouse against the other may properly be introduced. (*In re Steve* (1946) 73 Cal.App. 2d 697, 714 [167 P.2d 243].)

Moreover, none of the purposes said to underlie section 1322 would be served by excluding the testimony offered here, while the intended operation of section 190.1 would be impaired by such a ruling. Apparently the common-law rule codified by section 1322 had its origins in the now defunct fiction that a man and his wife are a single legal entity. (See 8 Wigmore, Evidence (McNaughton rev. 1961) § 2228, p. 214.) Recent attacks on this anachronistic concept have resulted in the demise of many aspects of interspousal legal immunity (e.g., *People* v. *Pierce* (1964) 61 Cal.2d 879 [40 Cal.Rptr. 845, 395 P.2d 893] [conspiracy between husband and wife]; *Klein* v. *Klein* (1962) 58 Cal.2d 692 [26 Cal.Rptr. 102, 376 P.2d 70] [negligent torts]; *Self* v. *Self* (1962) 58 Cal.2d 683 [26 Cal.

---

[3] ". . . or in case of criminal actions or proceedings for a crime committed by one against the person or property of the other . . . or in cases of criminal violence upon one by the other, . . ." (Pen. Code, § 1322.)

Rptr. 97, 376 P.2d 65] [intentional torts]), and we are not persuaded to revive the fiction in the present context.

It is also said that the rule has survived because of another policy consideration, the desire to preserve marital harmony. (*Young* v. *Superior Court* (1961) 190 Cal.App.2d 759, 764 [12 Cal.Rptr. 331]; 8 Wigmore, Evidence (McNaughton rev. 1961) § 2228, pp. 216-217; 1 Cal. Law Revision Com. (1957) pp. F-14 et seq.; *Marital Privilege,* 8 Stan.L.Rev. (1956) 420, 421.) We agree with the court in the *Young* case, however, that "[marital] peace after violence, is doubtful." (*Id.* at p. 764 of 190 Cal.App.2d.) This would appear to be especially true where the spouse who has committed the prior acts of violence upon his mate has been convicted of a crime carrying a minimum sentence of life imprisonment, and where the assaulted spouse testifies voluntarily against the interest of the other. If any useful purpose can be found in keeping this evidence from the jury, other than mere homage to a formalistic interpretation of statutory language which itself is not unambiguous, we fail to see what that may be.[4]

We hold, therefore, that at a penalty trial the spouse of the defendant may not be compelled to testify against the latter, yet may do so voluntarily even in the absence of the defendant's consent when the testimony relates to prior acts of violence committed upon the witness-spouse by the defendant.[5] The testimony here was properly admitted into evidence and considered by the jury.

---

[4]Two other reasons for the rule are often mentioned. One is that "communications" between spouses are confidential. (Code Civ. Proc., § 1881, subd. 1.) Without passing on the validity of this rationale, it is enough to observe that the criminal assaults here in question cannot be considered privileged "communications" in any sense of the term.

The rule may also have arisen in part from a "natural repugnance" to the idea that one spouse, however guilty, might be convicted by testimony of the other spouse. Wigmore has sharply criticized this theory, insofar as it underlies testimonial immunity, as being contrary to the aims of justice. It is an impediment in the path of the pursuit of truth, serving no purpose except to make the administration of criminal justice a "kind of sport." (8 Wigmore, Evidence (McNaughton rev. 1961) *supra,* at p. 217.)

[5]Our holding herein is in full accord with section 970 of the newly-enacted Evidence Code (Stats. 1965, ch. 299), which declares that "Except as otherwise provided by statute, a married person has a privilege not to testify against his spouse in any proceeding." The exception refers to the several proceedings enumerated in section 972 (largely similar to present Pen. Code, § 1322), in which such testimony may be compelled regardless of the objection of either spouse. The penalty trial is not among the proceedings listed in section 972, and hence the witness-spouse retains the privilege not to testify in this situation. (For a full discussion of the spousal privilege under the new Evidence Code, see 7 Cal. Law Revision Com. (1965), pp. 178-185.)

430

■ Appellant raises two additional contentions. He asks for a reversal on the basis of alleged prejudice in the following question which the district attorney asked Mathis: ''Q. Did you ever have a conversation four days before the death of Vernon Ray with Kathy Taylor and Cyril Ash, your attorney, concerning getting rid of witnesses?'' Appellant answered negatively, and the court sustained counsel's objection to further questions along those lines. The district attorney attempted to justify the question as being relevant to the issue of motive. Although the question is based upon a remote inference and is improper, no prejudice appears in view of the negative rseponse.[6]

■ Appellant also resents questions of Still by his counsel concerning whether Mathis had ever hit Still and whether he had ever seen Mathis strike anyone else. The questions were admitted for the limited purpose of showing Still's state of mind, and the jury was so admonished. It was his contention that he participated in the events of the tragic night because of his fear of Mathis and had he refused, Mathis's known propensity for violence would have been visited upon him. A defendant claiming self-defense may testify about prior violent acts of his victim not only directed toward the defendant but also toward others in order to show the defendant's state of mind in relation to the victim (see *People* v. *Jones* (1955) 136 Cal.App.2d 175 [288 P.2d 544], and *People* v. *Jefferson* (1939) 34 Cal.App.2d 278 [93 P.2d 230]). The same rule is applicable to a situation in which a codefendant attempts to explain his relationship to his partner in crime, and hence the evidence here challenged was properly admitted. (See *People* v. *Villegas* (1938) 29 Cal.App.2d 658, 661 [85 P.2d 480]; to the extent that *People* v. *Sing Chan* (1944) 64 Cal.App.2d 167, 171 [148 P.2d 81], holds to the contrary, it is disapproved.)

---

[6]The district attorney was referring to a conversation he alleged had occurred shortly before the killing of Vernon Ray. Mathis had previously been charged with shooting Kathy Taylor. According to the district attorney, Mathis's counsel in that proceeding had advised Mathis that if Kathy were to leave California and were unavailable to testify against him, the prosecution would have to drop the case. The district attorney desired to show from this that Mathis knew of the importance of complaining witnesses, and was thereby motivated to kill Ray in order to prevent him from testifying regarding the robbery. In view of the court's refusal to allow further questions about the incident, and appellant's negative reply, it is unlikely that the jury was prejudiced by the matter. This is fairly typical of the type of ''harmless error'' which frequently arises as a result of the strategy and heat of any trial of this length and importance.

 Finally appellant contends that the court erred in allowing the playing of his recorded statement at the trial because it had been given without aid of counsel at a time when appellant had a right to such assistance.[7] (*Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].) There can be little question that appellant was entitled to counsel, and, as in *Escobedo*, unlike *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], he twice asked for his lawyer. While there is no indication the police purposefully denied appellant the right to counsel, it is also a fact that when attempts to reach the attorney proved futile the investigation proceeded without pause.

Here the interrogation had reached the accusatory stage. The Attorney General relies heavily on the fact that appellant's statement resulted in the arrest of a new suspect to establish that the police were still engaged in the investigatory stage of the unsolved crime, but this circumstance does not have the persuasive effect attributed to it.

No chance reasonably existed at the time of the statement that appellant would not eventually stand trial as at least one of those who had participated in this crime. The police knew that his first alibi was false, that he had come home at 3 a.m. Sunday in possession of an amount of cash which he did not have when he left, that Billy Still had implicated him, that he was the person who called Vernon Ray and asked him to come to the park, and that his hat was found at the murder scene. Nevertheless, the police were still uncertain as to the extent of appellant's and others' participation. The precise role of the cast of characters had not unfolded. The police already knew two persons who were involved—Mathis and Still—and the subsequent arrest of a third does not prove that the investigation had not focused on appellant as at least one culprit. The two conditions prescribed in *People* v. *Stewart* (1965) 62 Cal.2d 571, 577-579 [43 Cal.Rptr. 201, 400 P.2d 97], were met: Mathis was under arrest, and a process of interrogation that lent itself to eliciting incriminating state-

---

[7]Although appellant has alluded to the additional issue of voluntariness, an examination of the record discloses no question of that nature present. *Voir dire* examination of the interrogators revealed no instances of mistreatment with the possible exception of the medical attention given to appellant's thumb. However, appellant never complained that the pain caused by that injury prompted him to give the statement. Additionally, appellant had been in custody for only 24 hours when he made the statement and had been allowed eight or more hours of sleep.

ments was undertaken. Under the *Stewart* doctrine the accusatory phase had been reached and at that point appellant's right to counsel under *Escobedo* was undeniable.

The penultimate question raised is whether there was a conscious and knowledgeable waiver of right to counsel. As stated in *People* v. *Stewart* (1965) *supra,* 62 Cal.2d 571, 581, ''in order to establish a waiver of the right to the assistance of counsel the record must indicate that the defendant was advised of his right to counsel and to remain silent *or that he knew of these rights* and intelligently and knowingly waived them.'' (Italics added.) Ascertaining the latter alternative generally requires a difficult though not impossible subjective determination; here, however, we have a significant objective disclosure of appellant's knowledge in the testimony of the trip to the scene of the crime during which he urged his codefendant to remain silent and told him he had no duty to cooperate with the police. Rather than needing legal advice, this appellant assumed the role of a legal adviser to his codefendant.

Nevertheless it is difficult to hold that appellant waived rights of which admittedly he was not advised and of which, by virtue of the chronology of legal literature, he could not have been fully aware. This interrogation occurred prior to the decisions in *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], and *Escobedo* v. *Illinois* (1964) *supra,* 378 U.S. 478, and, as this court stated in *People* v. *Stewart* (1965) *supra,* 62 Cal.2d 571, 581, to presume ''that absent the warnings defendant knew of his right to counsel at the prearraignment stage prior to the time that the United States Supreme Court established this right in *Escobedo* would be to ascribe to him an utterly fictitious clairvoyance.'' Therefore we cannot find the conscious and knowledgeable waiver required by *Carnley* v. *Cochran* (1962) 369 U.S. 506, 516 [82 S.Ct. 884, 8 L.Ed.2d 70].

Finally we come to the issue of prejudice in the admission of the statement, which did not constitute a confession but was an attempted exculpatory statement. As in *People* v. *Hillery* (1965) 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382], appellant did not confess either the robbery or the murder, and indeed, if his statement had been true, he would have been exonerated from guilt and the ''stranger [who] resembled a person named Larry Jones'' would have been implicated. The recorded statement added little of an affirmative nature to the prosecution's case in chief, but was used to dis-

credit the testimony of appellant by showing that he had previously constructed an elaborate falsehood in an attempt to absolve himself. Adopting appellant's contention that the recorded statement should have been excluded, its elimination would merely have removed one additional reflection upon appellant's already badly tarnished image.

Furthermore, admissions made in the course of an attempted exculpatory statement are not prejudicially received when the defendant at the trial testifies to substantially the same admissions. (*People* v. *Hillery* (1965) *supra,* 62 Cal.2d 692, 712.) This rule is a modern adaptation of a long held doctrine that erroneous admission of evidence subsequently testified to by defendant himself is harmless. (See *People* v. *Sykes* (1955) 44 Cal.2d 166 [280 P.2d 769] ; *People* v. *Ketchem* (1887) 73 Cal. 635 [15 P. 353] ; *People* v. *Daniels* (1886) 70 Cal. 521 [11 P. 655] ; *People* v. *Marseiler* (1886) 70 Cal. 98 [11 P. 503] ; *People* v. *Cohen* (1949) 94 Cal.App.2d 451 [210 P.2d 911] ; *People* v. *Pratt* (1947) 77 Cal.App.2d 571 [175 P.2d 888] ; *People* v. *Booth* (1925) 72 Cal.App. 160 [236 P. 987].) In this instance the essential difference between the original statement and appellant's testimony was his shift from implication of a third person to his reliance upon a theory of self-defense. Thus, at the trial he conceded greater personal involvement than he admitted in his original statement.

There is no reasonable basis to conclude that appellant's decision to take the stand was "impelled" by the introduction of this attempted exculpatory statement. At the time he made that decision the following evidence, for example, had already been properly admitted against him: (1) codefendant Still had testified that Mathis plotted and executed the robbery-murder; (2) the victim's wife had testified that Mathis telephoned her husband requesting his presence at the fatal rendezvous; (3) an expert witness had testified that the victim was brutally beaten *after* he was supine; (4) a police investigator had testified to finding appellant's hat at the scene of the crime; (5) appellant's girl friend had testified that he returned to their domicile in the early morning hours on the night of the murder in possession of a large amount of cash, suddenly acquired; and (6) other witnesses had testified that the victim usually carried considerable cash on his person, but had none when he was found murdered.

This is a felony-murder case, and under the evidence appellant's participation in the robbery is incontrovertible. The

jury, responsive to this evidence, returned dual verdicts finding both defendants guilty of the robbery as well as the murder. In these circumstances appellant's attempted exculpatory statement was merely cumulative in effect, and was no more prominently featured in the trial than other evidence that was properly admitted and far more damaging.

After an examination of the entire cause, including a careful review of the evidence, we are of the opinion that there is no reasonable possibility that errors complained of might have contributed to the conviction, and there has been no miscarriage of justice. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 86 [84 S.Ct. 229, 11 L.Ed.2d 171].)

The judgments are affirmed.

Traynor, C. J., McComb, J., Peek, J., and Burke, J., concurred.

PETERS, J.—I dissent.

The majority admit that in this death penalty case error, constitutional error, was committed, but conclude that such error was not so prejudicial as to require reversal. With this conclusion I cannot agree. The error consisted of admitting into evidence, in the prosecution's case in chief, a recorded statement taken from defendant after he had twice asked for his attorney, and without warning him of his right to remain silent and his right to counsel. The majority concede that the taking of such statement under such circumstances violated the rule announced in *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. With this I agree. The majority also correctly rule that there was no waiver of these rights. The majority then hold that because the improperly secured statement was not a confession but an exculpatory statement the rule of *People* v. *Hillery*, 62 Cal.2d 692 [44 Cal. Rptr. 30, 401 P.2d 382], applies. With this I also agree. But then the majority hold that such error was not prejudicial within the meaning of article VI, section 4½, of the state Constitution as interpreted in *People* v. *Watson*, 46 Cal.2d 818 [299 P.2d 243]. With this I disagree.

The majority imply that the error was not prejudicial because, after the recorded statement was read to the jury as part of the prosecution's case in chief, the defendant voluntarily took the stand and testified to the same facts contained

in the improperly admitted statement. This is a misinterpretation of the record. Based upon this misinterpretation, the majority then rely on the well-settled rule that the erroneous admission of evidence as to facts subsequently testified to is harmless. That rule, based on sound principles of waiver, is a good and proper rule where applicable. Obviously, when hearsay or irrelevant or incompetent evidence is improperly introduced, and then the defendant takes the stand and elects to testify to the same identical facts, he has not been prejudiced by the error and has waived it. Even if the record were as interpreted by the majority it is doubtful whether that rule would be applicable here. The instant case was tried before the *Escobedo* case, *supra,* was decided. It is one thing to hold that where a person knows or should know that improper evidence has been admitted but then voluntarily takes the stand and testifies to the same facts, he waives the error. It is quite another to hold that a person knows or should know his constitutional rights before the courts have announced them. To so hold would be to impute omniscience to the appellant. How could he waive rights that he and this court did not know he had?

But the important fact is that the version given by appellant on the witness stand was not the same as that in the recorded statement. In fact, he took the stand to explain and to contradict that statement and to give an entirely different explanation of his presence at the scene of the crime. The improperly admitted statement introduced in the prosecution's case in chief, if true, would have exonerated Mathis of both the robbery and murder. The testimony given on his own behalf implicated Mathis to such an extent that it showed he was guilty of manslaughter and perhaps second degree murder. But he was convicted of first degree murder. If either the recorded statement or the testimony were true Mathis was not guilty of first degree murder. Mathis, on the witness stand, admitted giving the recorded statement to the police, admitted it was untrue, and attempted to explain why he had lied to the police.

The recorded statement was used mainly to discredit Mathis' credibility, and it certainly did just that. Had it not been introduced it is doubtful that appellant would have taken the stand. He must have been impelled to take the stand because, with the improper statement before the jury and with the properly admitted testimony before it, he stood impeached as one who told false stories to the police—i.e., as a liar. Of

course, he had a constitutional right not to take the stand. (*Griffin* v. *California*, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106] ; *Malloy* v. *Hogan*, 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653].) But he was practically forced to take the stand because the law enforcement officials had improperly secured from him and introduced into evidence the statement that he knew and the prosecution had proven was false. Obviously, had the statement not been introduced, it would not have been necessary to explain or to deny it. Obviously, he took the stand because he was under the practical compulsion to explain or deny that false statement, because otherwise it gave support to the argument that its very falsity showed a consciousness of guilt. Under such circumstances, his testimony, in a very real sense, was the "fruit of the poisoned tree." To hold that by taking the stand he waived the error is to ignore realities and to condone the very thing *Escobedo* and *Dorado* tried to prohibit. (See *People* v. *Davis,* 62 Cal.2d 791 [44 Cal.Rptr. 454, 402 P.2d 142].) This we should not do.

In my opinion the admission into evidence of this recorded statement was prejudicial in the reversible sense, and this is so whether the test for such prejudice is that used in *Watson* or a more liberal one.

The majority have cited both *People* v. *Watson, supra,* 46 Cal.2d 818, 836, and *Fahy* v. *Connecticut,* 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171], in applying a standard of reversible error and have thereby implied that both cases establish the same criteria. I disagree.

The federal standard of reversible error was clearly stated in *Fahy* v. *Connecticut, supra,* in 1963 as follows (at p. 86) : "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Requiring a finding that there is a "reasonable possibility" that the erroneously secured and admitted evidence "might have contributed to the conviction" is far different from requiring a finding that the error is harmless unless the court affirmatively finds that, as required by *Watson,* "it is reasonably probable" that without the error "a result more favorable" to the defendant would have been reached. The difference in language is not simply one of semantics. The state rule requires, before a case may be reversed, an affirmative finding that without the error it is reasonably probable that a different result would have been reached. The federal rule simply requires that there be a reasonable possibility that the error might have contributed to the verdict.

But this part of the discussion is academic. The error here involved is so serious that it requires a reversal whether the stringent rule of *Watson* or the more liberal rule of *Fahy* be applied. For this reason the judgments should be reversed.

Another serious error, and one that cannot but confuse the law, was committed by the majority in discussing the admissibility of the testimony given by Mrs. Mathis, the wife of the appellant, when called as a witness by the prosecution. On the penalty trial she was permitted to testify to various vicious assaults committed upon her by appellant, which assaults were in no way connected with the crime for which he was being prosecuted. This testimony was to the effect that Mathis had several times attacked and cut her with a knife, and another time had strangled her into unconsciousness with an electric cord. This testimony, if inadmissible, was highly prejudicial, particularly on the penalty trial. It pictured Mathis as a cruel sadistic beast, and well could have been a decisive factor in convincing the jury to impose the death penalty.

The majority first hold that when his wife was called as a witness Mathis did not object to her testimony, and that this constituted an implied consent to her testimony within the meaning of ''consent'' as used in section 1322 of the Penal Code. In this determination the majority are probably correct. (*People* v. *Singh,* 182 Cal. 457 [188 P. 987], and cases following it.)

This sufficiently disposes of this point.

But the majority do not stop there. They state: ''We further hold that the testimony would have been admissible even had appellant entered a timely objection.'' Then after laboring this point the majority conclude the discussion of this point with the statement:

''We hold, therefore, that at a penalty trial the spouse of the defendant may not be compelled to testify against the latter, yet may do so voluntarily even in the absence of the defendant's consent when the testimony relates to prior acts of violence committed upon the witness-spouse by the defendant.''

This discussion is the sheerest dicta and like most dicta very mischievous indeed. It is particularly vicious because it is clearly wrong and cannot help but confuse the law relating to the husband and wife privilege as it applies to penalty trials in death penalty cases. The erroneous dicta must therefore be discussed.

The conclusion that the testimony of appellant's wife was

admissible, even if an objection had been made, flies directly in the face of the applicable code sections. This cavalier treatment of the statutory provisions is rationalized on several grounds. It is first argued that such testimony is relevant, that it therefore should be before the jury on the penalty trial, and therefore should be and is admissible. This is a clear non sequitur.

The privilege here involved is set forth in two code sections. Section 1322 of the Penal Code provides:

"Neither husband nor wife is a competent witness for or against the other in a criminal action or proceeding to which one or both are parties, except with the consent of both, or in case of criminal actions or proceedings for a crime committed by one against the person or property of the other, whether before or after marriage or in cases of criminal violence upon one by the other, or upon the child or children of one by the other or in cases of criminal actions or proceedings for bigamy, or adultery, or in cases of criminal actions or proceedings brought under the provisions of section[s] 270 and 270a of this code or under any provisions of the 'Juvenile Court law.' "

Section 1881 of the Code of Civil Procedure provides: "There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be examined as a witness in the following cases:

"1. A husband cannot be examined for or against his wife without her consent; nor a wife for or against her husband, without his consent; nor can either, during the marriage or afterward, be, without the consent of the other, examined as to any communication made by one to the other during the marriage; but this exception does not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other, or for a crime committed against another person by a husband or wife while engaged in committing and connected with the commission of a crime by one against the other; or in an action for damages against another person for adultery committed by either husband or wife; or in a hearing held to determine the mental competency or condition of either husband or wife."

Portions of section 1881 not appearing in the Penal Code section have been held applicable to criminal trials. (*People* v. *Pittullo*, 116 Cal.App.2d 373 [253 P.2d 705].)

The two quoted statutes, in language too clear to be misinterpreted, limit the admissibility of one spouse's testimony as to violence against the witness by the other spouse, when proper objection is made, to ''actions or proceedings for a crime committed by one against the person or property of the other'' (Pen. Code, § 1322), or as expressed in section 1881 of the Code of Civil Procedure ''to a criminal action or proceeding for a crime committed by one against the other, or for a crime committed against another person by a husband or wife while engaged in committing and connected with the commission of a crime by one against the other.'' The privilege clearly applies to all civil or criminal proceedings where one spouse attempts to testify against the other spouse about violence against the witness in no way connected with the proceeding before the court except in very limited situations not here involved. The majority have disregarded and overlooked the fact that we are here dealing with a statute or statutes, and that the problem is not what the law should be but what the Legislature has prescribed. I could agree with many of the arguments made by the majority were they being made in support of a recommended legislative change. But here they are being made to support a reading out of the law of a legislatively prescribed privilege. That is not the function of a court.

The penalty trial is certainly an action or proceeding pending before the court. In fact it is an integral part of the criminal trial. Otherwise the bifurcated and trifurcated trial would be unconstitutional. (*People* v. *Troche,* 206 Cal. 35 [273 P. 767] ; app. dism. 280 U.S. 524 [50 S.Ct. 87, 74 L.Ed. 592].) Thus the same statutory rules govern both the guilt and penalty trials except where the statutes expressly provide that they are only applicable to one or the other phase of the trial.

The majority hold that section 190.1 of the Penal Code is such a statute, and that it impliedly modifies, repeals, amends and controls section 1322. It is contended that the enumeration in section 190.1 of the type of evidence that may be brought before the jury on the penalty trial indicates, in some undisclosed fashion, an intent to abrogate and abolish the husband and wife privilege insofar as the enumerated kinds of evidence are concerned. This is an obvious non sequitur.

Penal Code section 190.1 provides that evidence of ''the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or miti-

gation of the penalty'' may be presented to the jury as factors to be considered in its determination of life or death. This is a simple relevancy statute, not one that makes otherwise inadmissible evidence admissible. The only purpose for the enumeration in the statute is to broaden the relevancy rules on the penalty trial, because much of the enumerated evidence would not be admissible, for relevancy reasons, on the guilt phase of the trial. The majority opinion necessarily holds that a general statute broadening the relevancy rule must affect the husband and wife privilege found in a specific statute. In other words all relevant testimony of the types enumerated is admissible, in spite of specific statute providing to the contrary. The fallacy of this reasoning is that it fails to recognize that in all cases, and in all situations, the husband and wife privilege is meaningful only when it is presupposed that the witness-spouse will relate relevant evidence. The very purpose of the privilege statute is to exclude otherwise relevant testimony. There would be no need for the privilege if the witness-spouse's testimony could be excluded on grounds of irrelevancy.

The majority argue at length that the purposes for the husband and wife privilege have been outgrown, and would not be served in the situation where the witness-spouse testified against the defendant-spouse at the penalty phase of the trial. These are good arguments in support of a legislative repeal of the privilege. They constitute nothing more than an indictment of the theory behind the privilege. They are not applicable to an interpretation of the statutory privilege. These arguments amount to an abuse of the judicial function. They were all answered in *Bassett* v. *United States*, 137 U.S. 496 (at pp. 505-506 [11 S.Ct. 165, 34 L.Ed. 762]) as follows:

''It was a well-known rule of the common law that neither husband nor wife was a competent witness in a criminal action against the other, except in cases of personal violence, the one upon the other, in which the necessities of justice compelled a relaxation of the rule. . . . We do not doubt the power of the legislature to change this ancient and well-supported rule; but an intention to make such a change should not lightly be imputed. It cannot be assumed that it is indifferent to sacred things, or that it means to lower the holy relations of husband and wife to the material plane of simple contract. So, before any departure from the rule affirmed through the ages of the common law,—a rule having its solid foundation in the best interests of society,—can be adjudged, the language declaring

the legislative will should be so clear as to prevent doubt as to its intent and limit."

In *Meade* v. *Commonwealth,* 186 Va. 775 [43 S.E.2d 858], the Supreme Court of Appeals of Virginia had the following to say (at p. 862 [43 S.E.2d]): "Professor Wigmore in his excellent work on Evidence, 3rd Ed., Vol. VIII, page 221 et seq., vigorously attacks the privileges granted by the common law rule and the reasons upon which the rule is based. We are not, however, called upon to pass upon the reasons for the rule, or the wisdom of the law. A lack of good reason may be ground for the legislature to change the law; but we must construe the law as it is."

A second claimed basis for the majority rule is that "Since the testimony of Mrs. Mathis would have been admissible under the provisions of section 1322 at a trial for the acts to which she testified, it was admissible at this penalty trial." This holding, as already pointed out, flies in the face of the language of the section.

There have been very few cases discovered where the witness-spouse is asked to testify to acts amounting to crimes committed against her by the defendant-spouse at a trial other than for the commission of those crimes. In the cases found involving this situation the courts have held that such testimony would be improper. The Texas Court of Criminal Appeals has so held on two different occasions (*Brock* v. *State,* 44 Tex.Crim.Rep. 335 [71 S.W. 20, 100 Am.St.Rep. 859, 60 L.R.A. 465]; *Rogers* v. *State* (Tex.Crim.Rep.) 368 S.W.2d 772) and has cut back on the rule only when clear dictates of necessity so demanded (*Newman* v. *State,* 151 Tex.Crim. Rep. 628 [210 S.W.2d 171]). (Cf. *People* v. *McCormack,* 278 App.Div. 191 [104 N.Y.S.2d 139], affd. without opn., 303 N.Y. 782 [103 N.E.2d 895].)

California has likewise, by its code provisions, recognized that under certain circumstances, not here present, testimony of crimes committed against a spouse may be compelled at a trial other than for that crime. Specifically, evidence of crimes committed upon a child or children of one spouse by the other (Pen. Code, § 1322) and crimes committed upon the witness-spouse by the defendant-spouse in the course of a crime committed against a third party (Code Civ. Proc., § 1881) may be testified to by the witness-spouse at the defendant-spouse's trial for crime committed against the child or third person. In other words, the Legislature has provided that where it thinks necessity exists in the sense that a most

important (and sometimes only) witness would otherwise be unavailable by operation of the husband and wife privilege, the rule will be relaxed. But the liberalizing of the rule under these circumstances is under specific statutory authority and the court should not create other exceptions.

As already noted the power to alter the privilege statute as urged by the majority lies solely with the Legislature. Quite recently the Legislature has exercised that power by the adoption of the Evidence Code. The new Evidence Code clears up the question as to when the witness-spouse may be compelled to testify against the defendant-spouse. The new code provides that the witness-spouse may be compelled to testify at "A criminal proceeding in which one spouse *is charged with*" (italics added) and then follows the same enumeration of crimes as is contained in the existing statutes. (Evid. Code, § 972, subd. (e).) The defendant, in the instant case, was not charged with assault upon his wife but rather was tried for the murder of Vernon Ray.

The holding in the majority opinion that the defendant-spouse's acts upon the witness-spouse may be testified to by the witness-spouse will have the effect of undercutting this specific legislative intent at a time even prior to the effective date of the legislation.

I would reverse the judgments.

TOBRINER, J.—I concur in the majority opinion as to the guilt trial but I dissent as to the penalty trial upon the grounds stated in the dissenting opinion of Mr. Justice Peters.

Appellant's petition for a rehearing was denied November 10, 1965. Peters, J., and Tobriner, J., were of the opinion that the petition should be granted.