**Dovie Carl MATHIS, Appellant,**

v.

**Louis S. NELSON, Warden, California State Prison, Tamal, California, Appellee.**

**No. 22469.**

United States Court of Appeals
Ninth Circuit.

June 4, 1969.

Rehearing Denied Aug. 5, 1969.

---

Robert Carl Herr (argued) (main counsel), David Frohnmayer, San Francisco, Cal., Samuel D. O'Brian, San Jose, Cal., for appellant.

Robert R. Granucci (argued), Deputy Atty. Gen., Thomas C. Lynch, Atty. Gen., Edward P. O'Brien, Deputy Atty. Gen., San Francisco, Cal., for appellee.

Before BARNES and HAMLEY, Circuit Judges, and SMITH,* District Judge.

BARNES, Circuit Judge:

This is an appeal in forma pauperis by a state prisoner from the denial of his petition for a writ of habeas corpus by the district court. (28 U.S.C. § 2241.) A certificate of probable cause was issued.

The basis of the writ sought was (1) that appellant had been coerced into giving an incriminatory statement to the police while in custody; (2) that references to re-enactment of the crime (and appellant's reaction thereto) violated defendant's privilege against self-incrimination; (3) that the exclusionary rule enunciated in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), has application here, despite the rule of non-retroactivity established in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), because to apply *Johnson* would deprive appellant of due process of law.

Appeal is properly taken to this court. 28 U.S.C. § 2253.

Appellant was convicted of murder in the first degree by a jury in the Superior Court of Santa Clara County, California, and, after trial as to penalty, was sentenced to death. On his automatic appeal to the Supreme Court of California, appellant's conviction and sentence were affirmed. People v. Mathis, 63 Cal.2d 416, 46 Cal.Rptr. 785, 794, n. 7, 406 P.2d 65 (1965). His petition for certiorari was denied by the Supreme Court of the United States on October 10, 1966. 385 U.S. 857, 87 S.Ct. 105, 17 L.Ed.2d 84 (1966). Habeas corpus petitions addressed to the Supreme Court were twice denied; the first on January 19, 1966 and the second on November 23, 1966.

Thereafter appellant filed his petition for habeas corpus in the United States District Court. That court issued an order to show cause, and immediately appointed counsel to represent appellant. A return was filed by the warden of San Quentin Prison, and a stay of execution and an evidentiary hearing had in the district court. This was described by Judge Wollenberg as a full hearing, which it was. The then petitioner was

* Hon. Russell E. Smith, Chief Judge, United States District Court, Billings, Montana, sitting by designation.

present and testified, and was at all times supplied with full and adequate legal representation.

The facts which resulted in Mathis' state conviction are stated by the California Supreme Court at 63 Cal.2d at 419–422, 46 Cal.Rptr. at 787–789, 406 P.2d at 67–69, as follows:

"The two defendants [appellant Mathis and Billy Clyde Still, his accomplice] were convicted of killing Vernon Ray in the process of robbing him of approximately $600 which he had on his person. The events took place on the evening of Saturday, October 19, 1963, and the early morning hours of Sunday, October 20, 1963, after Ray had displayed a large amount of cash in the presence of a waitress at Fisher's bar in San Jose. Ray had been in the bar early Saturday evening and had left shortly before 8 p. m.

"Billy Still arrived at Fisher's bar sometime during the evening after Ray had left, and heard tales of the money from the waitress. Mathis arrived later, and Still recounted the story to him, calling upon the waitress to confirm it. Testimony was offered which established that both defendants were in financial straits that evening.

"Sometime after midnight Mathis proposed that the two leave the bar. He then drove Still to the home of his sister in San Jose where they admitted themselves with Mathis's key and telephoned Ray. Mathis told Ray that his car was stuck in the mud in Alum Rock Park, in San Jose, and asked Ray to drive to the park and pull him out with his pickup truck. Ray agreeably consented and, upon informing his wife and guests of his intentions, left his home about 1:30 a. m.

"Mathis and Still then drove to Alum Rock Park, positioned their automobile off the road and waited for Ray who arrived momentarily. Mathis, meanwhile, had instructed Still to take the revolver he had in his car and hit Ray over the head with it at an appropriate moment. Still objected to the use of the revolver, so Mathis then proposed that Still use a tire wrench which he obtained from the trunk of his car. Still took the wrench and hid in the bushes nearby.

"When Ray arrived he backed his truck to the Mathis car, connected a line between the two vehicles, and attempted to tow the car. Mathis, however placed his foot on the brake of his car to create the impression that the car was stuck. He eventually released the brake allowing Ray to pull the car free, whereupon Ray got out of his truck and proceeded to release the cable. At that moment, as Ray was bent over the towline, Still crept up from behind and hit him over the head with the tire iron. Ray was stunned, but not unconscious, and fled to a nearby creekbed. Mathis and Still chased him, and Mathis caught him at a point a quarter of a mile up the creek. A scuffle ensued during which Mathis knocked Ray unconscious with a large rock. He then told Still to get the money from Ray's pocket, and this Still did. Mathis then administered the coup de grace by striking several frontal blows to the head of the supine victim with either the same or another large rock.

"The two then departed from the scene, Still driving Ray's truck, using a pair of gloves furnished by Mathis, and Mathis driving his own car. Mathis returned to the apartment in East Palo Alto where he lived with a young woman named Kathy Taylor, arriving about 3 a. m. He complained of an injured thumb, telling Kathy that he had been in a fight and that if anyone inquired she was to say that he had been home since 8 p. m. that evening.

"Mathis and Still met on Sunday morning and disposed of the clothes they had worn the previous night by throwing them into the bay. About 3 p. m., Sunday, Mathis was arrested by San Mateo County sheriff's deputies and taken to the Redwood City jail where San Jose police officers

questioned him. Mathis told them he had been home all night, and Kathy confirmed his story. He was then taken to San Jose for further questioning until about 11 p. m., when he was allowed to sleep. At the time he was arrested Mathis's thumb appeared to be split, but he had no other serious injuries. He told officers that he had caught his thumb in the door of his car.

"On Monday morning the interrogation resumed about 8:30 a. m. and Mathis continued to deny all, even when told that Kathy had changed her story and had admitted that he had not returned home until 3 a. m. During the course of the interrogation Monday morning Mathis requested to see his attorney. He was then being represented by Cyril Ash, a San Jose attorney, in another criminal matter. The officers attempted to telephone Ash, but his line was busy. The questioning continued.

"At 11 a. m. Monday, Still was arrested and immediately gave a complete statement to the police implicating Mathis as the major perpetrator of the crime. Confronted with the evidence the police now possessed, Mathis again requested to see his attorney and again the police placed a call to Ash's office, this time reaching his secretary who told them the attorney was in court. The officer left word for Ash to call the police department in regard to a client who wished to see him. Following this call Mathis agreed 'to tell the truth,' and a recorded statement was taken from him. That statement was later introduced at the trial.

"The statement which Mathis gave, however, was neither a confession nor the truth. It was an attempt to absolve himself from both the robbery and the murder by casting suspicion upon a third individual. Mathis told the police that although he had been in Alum Rock Park and had parked his car off the road as though stuck, he had done so at Still's suggeston; that

he had merely accompanied Still at the latter's importuning and had no idea what Still planned to do about Ray's money; that while Ray was hooking up the tow cable, a mysterious stranger appeared from the bushes and, confusing him with Ray, hit him, Mathis, over the head, rendering him unconscious; that the stranger and Still then robbed and killed Ray. He indicated that the stranger resembled a person named Larry Jones he had seen talking with Still at Fisher's bar.

"The police then apprehended Jones, who was held for a brief period and released when his alibi was substantiated. During the remainder of the investigation Mathis gave no further statements, and, during a trip to the scene of the crime with Still, he urged Still not to cooperate with the police, reminding him that he had no duty to do so.

"At the trial the recorded statement was used to discredit the appellant's veracity. The prosecution demonstrated that the exculpatory elements of the story were fabrications. Mathis, testifying on his own behalf, admitted enticing Ray into the park, but said it was part of a plan devised with Mrs. Ray to test Ray's fidelity to his wife. He said that he was surprised when Still hit Ray over the head. He denied giving Still the tool and said that Still had disappeared in to the bushes as soon as they had parked the car and that he assumed it was because Still needed to relieve himself. According to Mathis, Still did not hit Ray hard enough to knock him unconscious and Ray had then taken the tool from Still and charged after Mathis while uttering oaths about Mathis 'playing around' with his wife. Mathis said he ran to the creek where Ray eventually caught up with him. Ray attempted to hit him several times while Mathis protested that he did not want to fight. After warding off several blows Mathis managed to trip Ray, who fell into the creek. Mathis said he then picked up a rock and hit Ray

once on the back of the head and then ran from the scene. He said that Still had apparently followed them down to the creek, waited until Mathis hit Ray and ran, and then had taken Ray's money and killed him.

"Appellant testified he had given a false statement to the police because he was tired and depressed, wanted to see his lawyer, and thought that if he told a story that brought a new suspect into the investigation he would gain some time and relief from the questioning.

"At the penalty phase of the trial the prosecution asked for the death penalty for Mathis but not for Still. Two character witnesses testified to instances of prior violence by Mathis for which he had been convicted. The district attorney stressed that Mathis had tried to implicate an innocent man in this crime."

We can do no better than to quote the language used by the district judge in his careful consideration of incidents and the facts surrounding the giving of the petitioner's incriminating statement.[1]

"The crime of which petitioner was convicted took place around 1:30 a. m. on October 20, 1963. Petitioner was arrested at about 3:00 p. m. that same day. After being arrested he was taken to the San Mateo County jail in Redwood City, and questioned by the San Jose police for about half an hour. Petitioner at this time told police that he had been home all night and knew nothing about the crime. About 6:00 p. m. he was taken from Redwood City to the San Jose Police Station, and from 7:00 p. m. to 11:00 p. m. he was questioned further. His story that he had been home all night did not change. At 11:00 p. m. he was taken to the Santa Clara City Jail, and was left alone until 8:00 a. m. the next morning, Monday, October 20, 1963.

At this time he was taken back to the San Jose police department and questioned further. All morning he stuck to his alibi that he had been home all night.

"Sometime after noon petitioner changed his story, and at 2:45 p. m. he made a formal statement to the police which was transcribed on a recording disc with his knowledge. In this statement he retracted his first story and admitted being at the scene of the crime at the time of the crime, but said that he was not responsible for the murder and gave an elaborate explanation about what happened. At trial petitioner took the stand and told a third story regarding the events which took place at the scene of the crime and repudiated many of the points set forth in the statement referred to above. The statement was introduced at trial and the disc recording played to the jurors for the purpose of putting petitioner at the scene of the crime and as evidence of prior inconsistent statements.

"Petitioner's contention and ground for relief in this Court is that the 2:45 p. m. statement was not given to the police voluntarily, and that when this statement was used against him at trial, petitioner's right to be protected against self-incrimination was violated."

We next consider seriatim the various matters urged by appellant, and the manner in which they were determined by the able district judge.

I

■ The primary question before the district court ("the ultimate test," Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)) was whether the statement given by the defendant was the result of coercion, *i. e.*, whether it was involuntary—not "an independent decision" on his part. If the

1. We note the district judge assumed that, since *Miranda*, there is no distinction between an exculpatory statement and an inculpatory statement. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We assume, with him, there was here an incriminating statement.

petitioner's conviction was based, in whole or in part, on an involuntary confession, regardless of its truth or falsity, petitioner's constitutional rights have been violated. Miranda v. Arizona, 384 U.S. 436, 464, n. 33, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

On this appeal, and particularly on this part of it, appellant relies heavily on Culombe v. Connecticut, *supra*. We paraphrase or quote some of its passages to guide us in testing the facts of this case.

"No single litmus-paper test for constitutionally impermissible interrogation has been evolved * * *." 367 U.S. at 601, 81 S.Ct. at 1878.

* * * * * *

"The inquiry * * * involves; at the least, a three-phased process. First, * * * finding the crude historical facts * * *. Second, because the concept of 'voluntariness' is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal 'psychological' fact. Third, there is the application * * * of * * * rules of law * * * which * * comprehend both induction from and anticipation of, factual circumstances." *Id.* at 603, 81 S.Ct. at 1879.

* * * * * *

"This means that all testimonial conflict is settled by the judgment of the state courts. Where they have made explicit findings of fact, those findings conclude us and form the basis of our review * * * [except] we are not bound by findings wholly lacking support in evidence." *Id.*

"[D]etermination of how the accused reacted to the external facts, and of the legal significance of how he reacted—although distinct as a matter of abstract analysis, become in practical operation inextricably interwoven." *Id.* at 604, 81 S.Ct. at 1880.

"[This] mental state of involuntariness upon which the due process question turns can never be affirmatively established other than circumstantially —that is, by inference * * *. Great weight, of course, is to be accorded to the inferences which are drawn by the state courts. In a dubious case, it is appropriate, with due regard to federal-state relations, that the state court's determination should control." *Id.* at 605, 81 S.Ct. at 1880.

* * * * * *

"The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the [incriminating statement]." *Id.* at 602, 81 S.Ct. at 1879.

■ Our task is to apply these tests to the facts of this case, as did the district judge. Appellant's counsel urges that the district court's "findings of fact * * * and the undisputed testimony in the record compel the conclusion that appellant's statements were the product of an overborne will." (Opening Brief, p. 12. The trial court disagreed, and we disagree.

One of the most unique features of this case is that "during *the entire time* petitioner was being questioned in the interrogation room at the San Jose Police Station on October 20 and 21, the conversations between petitioner and police were being tape recorded," (emphasis added) and the tapes were admitted into evidence at the evidentiary hearing before the district court (Exs. 1–6, inclusive). The accuracy of the tapes is not disputed.

It should be kept in mind that the district judge heard the recordings of everything said by appellant and the police from the time of his arrest at 3:00 p. m. on October 20, 1963, to and through the statement made at 2:45 p. m. on October 21, 1963. His findings and conclusions are the result of what he had heard. In other words, the accuracy and authenticity of the tapes not being in dispute, this is one case where "the judge was there."

A second noteworthy feature of this case is the lack of any evidence of the

slightest mistreatment by the police during the interrogation. As District Judge Wollenberg pointed out, the Supreme Court of California considered this factor in its opinion affirming petitioner's conviction and sentence, as follows:

"[A]n examination of the record discloses no question of that nature [the voluntariness of the statement] present. *Voir dire* examination of the interrogators revealed no instances of mistreatment with the possible exception of the medical attention given to appellant's thumb. However, appellant never complained that the pain caused by that injury prompted him to give the statement. Additionally, appellant had been in custody for only 24 hours when he made the statement and had been allowed eight or more hours of sleep." 46 Cal.Rptr. at 794–795, n. 7, 406 P.2d at 74.

The pertinence of this observation is emphasized by the lack of emphasis on this appeal of any charge of physical coercion occurring during detention.

" '[T]he blood of the accused is not the only hallmark of an unconstitutional inquisition.' Blackburn v. Alabama, 361 U.S. 199, 206 [80 S.Ct. 274, 4 L.Ed.2d 242] (1960). It is psychological coercion which confronts this Court in appellant's case." (Appellant's Opening Brief, p. 12.)

As to an alleged lack of food, the district court carefully and accurately read the record, and stated:

"Petitioner was fed only one sandwich between the time of his arrest and his 2:45 statement. He was given this sandwich around noon on October 21. Other than petitioner's testimony there was no evidence that the lack of food could be attributed to an attempt of the police to starve petitioner. There was never a time anywhere on the tapes when petitioner asked for food. Nor on the tapes was there ever a time when the police withheld food on the condition that petitioner make a statement. There was evidence that on the morning of the 21st of October petitioner was offered breakfast at the city jail. Several places on the tapes petitioner while referring to his activities after he had arisen from bed Sunday morning, October 20, stated that he never ate breakfast; this would account for his refusal to eat breakfast on October 21." (Exhibit A, Appellee's Brief, p. 5.)

The district judge also went into the facts of alleged intoxication:

"Petitioner's allegation that he was inebriated is not born [*sic*] out by the evidence. At 9:10 p. m. on the evening of October 20, a sample of blood was taken from petitioner. When analyzed this blood showed an alcohol content of .02%. See p. 501 and p. 554 of the trial transcript. Thus whatever petitioner's condition when he was arrested, by the morning of October 21 he could not have been suffering from the effects of alcohol. Even on Sunday evening the tapes indicate that petitioner's elocution was not hampered at all, and he never wavered regarding the details of his story. Thus whatever the state of petitioner's mind shortly before his 2:45 p. m. statement, it was not the result of alcohol." *Id.*

The next point urged by appellant is the alleged failure to call an attorney for him. This was considered by the district court, who wrote as follows:

"Petitioner was without the benefit of advice of any lawyer during the entire period of his interrogation. The tapes have recorded two separate occasions on which he sought the opportunity to talk to his lawyer. On the first the police refused. On the second, which occurred just before petitioner gave his 2:45 p. m. statement, the police officer who had been interrogating petitioner telephoned the office of petitioner's lawyer but was unable to reach the lawyer. Petitioner alleges that he made many more requests to see his lawyer outside the interrogation room and earshot of the tape recorder.

"Petitioner's trial began on April 21, 1964 before both Escobedo v. Illinois, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed. 2d 977] (June 22, 1964) and Miranda v. Arizona, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (June 13, 1966). Thus under the rule established in Johnson v. New Jersey, 384 U.S. 719 [86 S.Ct. 1772, 16 L.Ed.2d 882] (1966), the constitutional right to have a lawyer when police exercise custody over a person and the right to be informed of this do not apply retroactively to petitioner Mathis. On the other hand the lack of counsel during police interrogation is an important factor to be considered in deciding whether a given statement has been coerced. Davis v. North Carolina, 384 U.S. 737 [86 S.Ct. 1761, 16 L.Ed.2d 895] (1966). Thus the issue before the Court in this connection is the extent to which petitioner's lack of counsel had a coercive effect in producing petitioner's 2:45 p. m. statement.

"Two facts tend to refute petitioner's allegation that the lack of a lawyer infected the voluntariness of his statement. On the evening of the 21st, petitioner and two other men agreed to make a jointly recorded statement of their conflicting versions of what happened. At the time of this jointly recorded statement petitioner referred to his request to talk to his lawyer just before making the 2:45 p. m. statement, and said that before he had given the 2:45 p. m. statement he had asked for his lawyer, but thereafter had decided to give the statement anyway. The comment says by itself what can be gleaned from listening to the tape. Petitioner was putting together a story which would save him from a murder charge. Not to insist on talking to his lawyer might make the statement more believable. But the correlary [sic] inference is that giving the statement was not tied to the lack of presence of counsel.

"It may be assumed that had a lawyer visited petitioner before he gave his 2:45 p. m. statement and the usual 'don't say anything' advice were given, the statement would not have been elicited. However, prior to the Escobedo decision, supra, police were not required to permit a suspect to see a lawyer when he was arrested. The fact that a prompt summoning of counsel would have saved petitioner from making the 2:45 p. m. statement is not proof that the lack of a lawyer subjected petitioner to coersion [sic]. As discussed below, it is the opinion of this Court that petitioner was induced to make the statement from an entirely different circumstance." (Exhibit A, Appellee's Brief, pp. 6–7.)

Appellant also urges that his physical condition weakened his mental condition and rendered him more susceptible to the incommunicado interrogation. This was likewise carefully considered by the district court, and found adversely to appellant.

"Petitioner's allegations regarding pain and suffering from various wounds and police extractions of blood and hair are completely without basis. Petitioner's thumb was injured and given limited treatment. Petitioner was stripped and police looked over his body for any other signs of a scuffle, but found none. Police were unable to detect any of the alleged gashes on the head and leg and chest at a time when they were energetically searching for this type of a clue. Petitioner registered no complaint regarding this pain to the police on the tapes, but arguably this could be explained by his attempts to avoid being placed at the scene of any altercation. This Court finds that the injuries to the head, the back, and the leg, if they did exist, were minor and were not debilitating, and as such could not have contributed significantly to petitioner's alleged fear, fatigue and confusion.

"The police did admit that on Sunday evening they took a sample of blood from petitioner and that they pulled several hairs from his head by the roots. Petitioner had given per-

mission to the police to take these samples, and he never complained on the tapes regarding the taking of these samples. Whatever pain petitioner suffered on these occasions was temporary and did not persist to the next morning.

"With regard to the interrogation by police, petitioner alleges that, 'Throughout the interrogation, the police used every method available to them, short of outright violance [*sic*], to coerce the petitioner into making the statements he ultimately made. The police frightened him, tired him, and verbally abused him throughout the interrogation period.' It is clear from the tapes that the questions asked by the police were directed towards getting a statement which incorporated some of the evidence they had against petitioner. However until his 2:45 p. m. statement petitioner did not change his alibi that he was home all night and that his thumb was smashed in a car door.

"The questions asked by police were not asked in a confusing manner or in a heated or vengeful manner. The questions and answers centered on the subject of exactly what petitioner had been doing and where he had gone all day Saturday, October 19 and Sunday, October 20. Much of the time was spent hashing through petty details. A constant subject of the questioning was a hat found near the murdered man's body, which police suspected belonged to petitioner. The explanation given by petitioner for the injury to his thumb was gone over by police time and time again. Petitioner was also repeatedly questioned regarding the source of some money he was supposed to have given a woman with whom he had been living. It is clear that the police were attempting to break down petitioner's first story and to trap him into self-contradiction." (Exhibit A, Appellee's Brief, pp. 7–9.)

The district court further found as to alleged *promises* that "what was said by police never amounted to a promise of any kind. The statements of the police were essentially informative" (*Id.* at 9), and "petitioner never responded to these alleged promises" (*Id.* at 10).

Next, the district court found as to alleged threats:

"Petitioner alleges also he felt threatened with bodily harm and intimidated by the police deprication [*sic*] of continually calling him 'nigger.' The tapes do not substantiate either of these charges. The police denied these allegations, specifically. This Court finds that petitioner's testimony in support of these allegations was completely untrue." (*Id.* at 10.)

Again, the district court found:

"that petitioner's allegation and testimony that his statement was connected with concern for the well being of Kathy Taylor [the woman with whom appellant was living] are a complete falsehood." (*Id.*)

With respect to appellant's last point raised on the issue of coercion—that the statement in question was given shortly after the police had arrested the alleged accomplice Still (on whom appellant had previously placed the blame for the murder) and that Still had given police a statement admitting participation in the crime and implicating petitioner—appellant's brief again overstates his case. This, he urges (Op. Brf., p. 21), was found by the district court "to be the *sole* reason for appellant giving the police the exculpatory statement." (Emphasis added.) The district court did *not* so find—it found the sequence of events "*significant.*" (Emphasis added. Exhibit A, Appellee's Brief, p. 11.)

The district court after referring to Billy Still's statement found:

"It is also the finding of this Court that at the time petitioner gave up his first alibi, he was not suffering from unusual fatigue or any confused state of mind. Petitioner gave his statement freely, voluntarily, and without compulsion or inducement of any sort." (Exhibit A, Appellee's Brief, p. 12.)

Throughout his opening brief, appellant refers to the law and facts of Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) as controlling . The district court rejected the compelling force of this case as follows:

"Petitioner cites Haynes v. Washington, 373 U.S. 503 [83 S.Ct. 1336, 10 L.Ed.2d 513] (1963) as a case almost identical on its facts with the present one and in which a confession was held to be involuntary. With regard to the facts recited by the United States Supreme Court one significant distinction is that the recital of voluntariness contained in the confession was infected with the promise of the police to let Haynes call his wife, in effect, only after Haynes gave police a statement. Here the recital of voluntariness in the 2:45 p. m. statement contains no such limitation, and on the tape the recital is spoken in a positive, convincing manner. Most significant in rejecting petitioner's comparison of the Haynes case, supra, is the picture this Court, after a careful review of the entire record, has gleaned of petitioner as being quite able to maintain complete control over what he would say and of his right to say nothing during the entire period of police interrogation." (Exhibit A, Appellee's Brief, p. 12.)

Upon appeal, unlike at the hearing, appellant strongly urges that Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) is controlling. Though an old case, it is still good law. Beecher v. Alabama, 389 U.S. 35, 39, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967). As Culombe, supra, suggests there is no single test, so Bram, supra, states "all the decided [English] cases necessarily rest upon the state of facts which the cases considered * * *." 168 U.S. at 557, 18 S.Ct. at 192. "[I]t has been settled that the mere fact that the confession is made to a police officer, while the accused was under arrest in or out of prison, or was drawn out by his questions, does not necessarily render the

confession involuntary * * *." Id. at 558, 18 S.Ct. at 192. The Bram facts differ from those here found. Cf. id. at 561–562.

The district court had an unusual opportunity to be itself a trier of fact in this matter. It heard the tapes and could assess the convincing force of the live testimony of the petitioner, and certain other witnesses. That court found, and we find, no cause to feel "the defendant's will was overborne at the time" he made his statement. Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963). The California Supreme Court opinion and findings (People v. Mathis, supra, 46 Cal.Rptr. at 794, n. 7, 406 P.2d at 74) carry a presumption they are correct. 28 U.S.C. § 2254 (d). United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296, 299 (2d Cir. 1968). This, plus the district court's careful consideration of the matter, and our independent study of the entire record (Spano v. New York, 360 U.S. 315, 316, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959)), causes us to conclude no error was committed by the district court in its consideration of the facts before it, nor in its interpretation of the law disputed here by appellant on the issue of coercion. We affirm the district court's finding that there was no coercion.

## II

Appellant's second alleged error is the effect of his participation (or lack of it) at a re-enactment by the codefendant Still of the murder in Alum Rock Park.

■ There appellant Mathis refused to participate in the re-enactment but stood mute. The district court judge had this to say:

"Petitioner has raised one additional issue. During petitioner's trial it was brought out on direct examination of a police officer that petitioner had stood mute and refused to participate in the re-enactment of the crime at the scene of the crime. The police initiated the idea of the reenactment, and had obtained Billy Still's cooperation. Petitioner alleges that the prosecution

improperly attempted to draw an inference of an admission of guilt from petitioner's silence in the face of the accusations which were inherent in the reenactment by Billy Still and the police's attempt to gain petitioner's cooperation.

"A thorough examination of the trial transcript reveals no place where anyone argued that petitioner's silence or refusal to participate should raise an inference of any kind of admission. Petitioner was not cross examined on this point. There are only two places in the prosecution's argument where the incident was even referred to. The first time, p. 1514 of the trial transcript, the reference was tangential to a point about the general consistency of Billy Still's various statements. The second time, at page 1544 of the trial transcript, the reference was in connection with the series of inconsistencies in the statements of petitioner Mathis. No objection was made by petitioner's counsel either time, and this Court finds no prejudice whatever to petitioner in either of the references during argument or when these facts were first adduced." (Exhibit A, Appellee's Brief, p. 13.)

Thus the facts of this case are distinctly different from those cited by appellant's counsel, where the Government attempted to prove the silence as an admission, or as impeachment. Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961); Helton v. United States, 221 F.2d 338 (5th Cir. 1955). And appellant has pointed out no evidence to contradict that relied upon by the district court.

### III

We decline to extend the *Escobedo* rule (*supra*) to cases excluded by the Supreme Court in Johnson v. New Jersey, *supra*. Appellant was brought to trial more than two months prior to the decision in *Escobedo*. If the *Johnson* rule does not deprive other defendants (whose trials started before June 22, 1964) of due process, it does not deprive

this appellant of due process. *Cf.* Davis v. North Carolina, *supra*; Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).

We affirm.